JOSEPHINE B., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.

No. S–12399.

Supreme Court of Alaska.

Aug. 24, 2007.

Rehearing Granted in Part Jan. 25, 2008.

Kathleen Murphy, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant.

Megan R. Webb, Assistant Attorney General, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

Josephine B. appeals a superior court order that adjudicated her daughter Ashley a child in need of aid under AS 47.10.011(8) because she had suffered mental injury. We affirm. The superior court applied the correct legal standard and its factual findings are not clearly erroneous.

## II. FACTS AND PROCEEDINGS

Josephine B. lived in Fairbanks with her husband Jacob and three children from her previous marriage: Benjamin, Ashley, and Rafe (born in 1991, 1992, and 1994, respectively).[1] In October 2003 Roger A., the children's biological father, filed with the Office of Children's Services (OCS) a report of harm that alleged that Josephine and Jacob were physically and emotionally abusing the

---

1. We use pseudonyms for all family members.

2. Some of these facts are taken from the transcripts of the December 2005 temporary custody

children.[2] In response, OCS sent two social workers to their home. During the investigation Josephine and Jacob denied the social workers access to the children. Because Josephine and Jacob had refused to cooperate and because the Fairbanks Police Department had indicated that the children "were seen and there was no evidence of abuse," OCS closed the case.

In March 2005 OCS received another report that Jacob was physically and mentally abusing the children, this time from an anonymous source. OCS again sent a social worker to the home but Jacob prevented him from interviewing the children without a court order. OCS obtained a court order and Jacqueline Swart, an OCS social worker and children services specialist, interviewed the children at a police station in May. During the interview Ashley was the only child willing to discuss the conditions in the home and she denied all of the allegations of harm. After the interview Swart reported that she felt the children had been coached not to answer her questions. Swart closed the investigation.

Later that year, Ashley began to sleep over at the home of Fran LoDuca, a family friend, where she helped LoDuca with housework and babysitting. On October 6, 2005 Ashley contacted social worker Swart from a telephone at LoDuca's house and told Swart that almost all of the allegations of harm that they discussed in the May interview were true. Ashley said that she and the other children were being subjected to a "military discipline technique" in which the children were forced to hold a push-up position while being swatted with a wooden paddle. Ashley also told Swart that Jacob was drinking almost every evening and when he drank he threw bottles and bottle caps at the children.

The next day Swart interviewed Ashley at LoDuca's house. Ashley told Swart that she was very fearful and that she did not want to go home. She explained that her brothers were being hit almost every day, that she had recently been hit, and that her brothers

---

hearing and the May 2006 adjudication and disposition hearing.

had acted in a sexually inappropriate manner toward her. When LoDuca refused to allow Ashley to return home, Josephine and Jacob went to LoDuca's house with a police escort and retrieved her.

On October 31, 2005 OCS filed a non-emergency petition for adjudication of the B. children as children in need of aid. A short time later, when Josephine was out of the house on an errand, Ashley telephoned Swart and asked in a panicked tone to be removed from the home. When Josephine returned from her errand, Ashley abruptly hung up.

After a December hearing the superior court found that the concerns in the non-emergency petition warranted emergency custody and therefore granted OCS emergency custody of the children. Swart then placed the children in an emergency foster home and filed an emergency petition for adjudication of the children as children in need of aid.

Later that month a temporary custody hearing took place before Master Katherine R. Bachelder. Master Bachelder found that there was probable cause to believe the children were in need of aid because their mother and stepfather's conduct had placed them at substantial risk of mental injury. This finding was adopted by the superior court on January 26, 2006. The superior court found that

> the children have been subjected to a chronic pervasive climate of fear in their mother's home, and that they were routinely threatened, yelled at, shamed, humiliated, verbally assaulted, bullied and physically abused. This conduct, described by the mother and stepfather as "discipline," has created a situation in which the children are at substantial risk for mental injury as a result of the moth-

er[ ] and stepfather's conduct and the conditions they have created in their home.

The superior court committed the B. children to OCS's temporary custody and recommended that OCS "provide the children with psychological evaluations without delay."

OCS referred the children to Dr. Marti Cranor for psychological evaluations. Ashley also began individual counseling sessions with Edward Fitzpatrick, a licensed clinical social worker.

A combined adjudication and disposition hearing was held in May 2006. At the conclusion of the hearing Master Bachelder found Ashley to be a child in need of aid under AS 47.10.011(8) because she had suffered mental injury. The superior court adopted this finding and issued an order adjudicating Ashley a child in need of aid. The order also set a permanency hearing for November 17, 2006.

Josephine B. appeals the adjudication order.[3]

## III. DISCUSSION

### A. Standard of Review

Josephine B. argues that the superior court erred in adjudicating Ashley a child in need of aid because it (1) misapplied AS 47.10.011(8)(A)'s legal standard for determining whether a child has suffered mental injury, and (2) incorrectly found that the evidence in this case was sufficient to establish that Ashley had suffered such an injury.

▪ Whether the superior court's findings are consistent with the Child in Need of Aid (CINA) statutes is a question of law.[4] We review questions of law using our independent judgment and will adopt "the rule of

---

**3.** Only the adjudication order is challenged in this appeal. The state did not initially challenge the appealability of the adjudication order entered under AS 47.10.080(a), even though the appeal was taken before entry of an order of disposition pursuant to AS 47.10.080(c). On rehearing, however, the state contends that an adjudication order taken alone is not appealable. We defer consideration of this question to a case in which the issue is timely raised. There is no jurisdiction bar involved in this decision since

this court has authority to consider adjudication orders entered prior to dispositional orders as petitions for review under Appellate Rule 402 if such orders are not appealable as a matter of right.

**4.** *Winston J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 134 P.3d 343, 345 (Alaska 2006) (citation omitted).

law that is most persuasive in light of precedent, reason, and policy."[5]

■ Whether the evidence supports the superior court's finding that Ashley suffered mental injury is a question of fact. We review the superior court's factual findings for clear error.[6] Clear error exists when we are "left with a definite and firm conviction that the superior court has made a mistake."[7]

### B. The Superior Court Did Not Err in Adjudicating Ashley a Child in Need of Aid.

Alaska Statute 47.10.011(8)(A) provides that a court may adjudicate a child in need of aid if it finds by a preponderance of the evidence that "conduct by or conditions created by the parent" have "resulted in mental injury to the child." For CINA adjudication purposes, "mental injury" means "a serious injury to the child as evidenced by an observable and substantial impairment in the child's ability to function in a developmentally appropriate manner and the existence of that impairment is supported by the opinion of a qualified expert witness."[8] The superior court adjudicated Ashley a child in need of aid under AS 47.10.011(8)(A) because it found that the "conduct of and conditions created in the home by [Josephine and Jacob B.] have resulted in mental injury to [Ashley] as attested by Dr. Cranor, a qualified expert in psychology."

### 1. The superior court did not misapply the legal standard for determining whether Ashley suffered mental injury.

■ The superior court held that Josephine and Jacob's conduct and the conditions they created in their home caused Ashley to suffer mental injury, as evidenced by what the court termed an "observable and substantial impairment in [Ashley's] ability to function in a developmentally appropriate manner." Josephine argues that the superior court applied an incorrect legal standard for determining whether Ashley suffered "mental injury" as that term is used in AS 47.10.011(8)(A).

Josephine points to examples of mental injuries found in AS 47.10.011(8)(A)'s legislative history[9] and our decisions in *V.S.B. v. State*,[10] *Martin N. v. State*,[11] and *Rick P. v. State*.[12] These examples, she argues, involve "gross parental misconduct that has significantly contributed to extremely serious mental conditions in their children." She seems to argue that evidence of "gross parental misconduct" is not merely sufficient to support a mental injury finding, it is necessary.

OCS responds by noting that the definition of "child abuse and neglect" under the federal Child Abuse and Prevention Treatment Act of 1996 (CAPTA) includes serious emotional harm.[13] It also notes that AS 47.10.011(8) was intended to bring Alaska's CINA statutes into compliance with CAPTA by including "mental injury" as one of the grounds for CINA jurisdiction.[14] Further-

---

**5.** *Gilbert M. v. State*, 139 P.3d 581, 586 (Alaska 2006) (quotation & citation omitted).

**6.** *Winston J.*, 134 P.3d at 345–46 (citation omitted).

**7.** *Id.* (internal quotation omitted).

**8.** AS 47.17.290(9). AS 47.10.990 provides that "[i]n this chapter, unless the context otherwise requires . . . (20) 'mental injury' has the meaning given in AS 47.17.290."

**9.** Minutes of the House Finance Committee hearing on HB 375, May 2, 1998, testimony of Assistant Attorney General Susan Wibker (Tape 98–143, Side A) (stating that the "thrust" of AS 47.10.011(8)(A)'s mental injury protection "was to get at the serious emotional harm being done to children").

**10.** *V.S.B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 45 P.3d 1198 (Alaska 2002).

**11.** *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50 (Alaska 2003).

**12.** *Rick P. v. State, Office of Children's Servs.*, 109 P.3d 950 (Alaska 2005).

**13.** 42 U.S.C. § 5106g(2) (2007).

**14.** *See* 1998 Inf. Op. Att'y Gen. No. 126 (June 3) ("HB 375 would bring the state into compliance with CAPTA by including mental injury and substantial risk of mental injury as grounds for CINA jurisdiction."). *See also* Minutes of the House Judiciary Committee hearing on HB 375,

more, OCS notes that although CAPTA itself does not define "emotional harm," the U.S. Department of Health and Human Services has defined "emotional abuse" as "a pattern of behavior that impairs a child's emotional development or sense of self-worth. This may include constant criticism, threats, or rejection, as well as withholding love, support, or guidance." [15] OCS argues that "[t]his category of abuse does not include only the most severe and egregious incidents, as Josephine appears to suggest," but rather "a much wider spectrum of parental conduct and harm to a child."

▆▆▆▆ We apply our independent judgment to questions of law, and will adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[16] If the statute is ambiguous, we apply "a sliding scale of interpretation, where the plainer the language, the more convincing contrary legislative history must be." [17] We interpret Alaska law "according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters." [18]

Alaska Statute 47.10.011(8)(A) provides that a court may adjudicate a child in need of aid if it finds by a preponderance of the evidence that "conduct by or conditions created by the parent" have "resulted in mental injury to the child." Alaska Statute 47.17.290(9) states that a mental injury finding must be supported by a qualified expert witness's opinion that the child has suffered a serious injury, "as evidenced by an observable and substantial impairment in the child's ability to function in a developmentally appropriate manner." Because it applied the standard from AS 47.17.290(9) almost verbatim to the facts in this case, the superior court did not use an incorrect standard.

Josephine's apparent argument that the superior court must find "gross parental misconduct" in order to conclude that a child has suffered mental injury is not supported by either AS 47.10.011(8)(A)'s legislative history or our caselaw.

The legislative history that Josephine cites is not inconsistent with the plain words of AS 47.17.290(9), which the superior court applied correctly. Our decisions in V.S.B.,[19] Martin N.,[20] and Rick P.,[21] also cited by Josephine, are similarly consistent with the text of AS 47.17.290(9). In V.S.B., the superior court found that the appellant's four children had suffered mental injuries under AS 47.10.011(8)(A).[22] We upheld that finding because the appellant's four children, described by the superior court judge as " 'among the most damaged children' she had seen in twenty-five years [of] 'practicing in the area of children's law,' " had severe mental injuries that were "confirmed by multiple therapists and social workers." [23] In Martin N., the superior court found that the appellant's pattern of domestic violence qualified as behavior that "would, if continued, result in mental injury" to the appellant's child.[24] We upheld the superior court's finding that the appellant's child was in need of aid under AS 47.10.011(8).[25] In Rick P., the superior court found that the appellant, by assaulting his domestic partners and shifting households

April 23, 1998, testimony of Lisa Torkelson, Legislative Assistant to Representative Fred Dyson (Tape 98–66, Side B) (" '[E]motional harm' in the original version was a new term, with a new definition. And we felt [that "emotional harm"] was a little broad and could be construed, possibly, or abused, and so we preferred ["mental injury"], as long as [it] met with federal standards.").

15. U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES, WHAT IS CHILD ABUSE AND NEGLECT? 3 (2006), http://www.childwelfare.gov/pubs/factsheets/whatiscan.pdf.

16. Young v. Embley, 143 P.3d 936, 939 (Alaska 2006) (quotation omitted).

17. Id. (internal quotation & citation omitted).

18. Id. (citation omitted).

19. V.S.B., 45 P.3d at 1204.

20. Martin N., 79 P.3d at 55.

21. Rick P., 109 P.3d at 955–56.

22. V.S.B., 45 P.3d at 1203–04.

23. Id. at 1204.

24. Martin N., 79 P.3d at 55.

25. Id.

frequently, among other things, had caused his child to suffer mental injury under AS 47.10.011(8)(A).[26] We held that because it was supported by the testimony of two clinical psychologists, the superior court's finding was not clearly erroneous.[27] In no case, however, have we departed from AS 47.17.290(9)'s definition of mental injury when applying AS 47.10.011(8)(A).

Josephine's argument that CINA jurisdiction should only be based on parental conduct that causes substantial mental injuries is well-taken. But that requirement already appears in the text of AS 47.17.290(9), which the superior court applied almost verbatim when it adjudicated Ashley a child in need of aid. Josephine's apparent argument that the superior court erred by not finding "gross parental misconduct" is without merit.

### 2. The superior court did not clearly err in finding that Ashley has suffered mental injury as that term is defined by AS 47.17.290(9).

██ Josephine also argues that the evidence does not support the superior court's finding that Ashley suffered a serious mental injury. She argues that the evidence merely shows "[s]trict adherence to house rules [and] physical discipline," which is insufficient to demonstrate that "Ashley had suffered [an] observable and substantial impairment that prevented her from functioning in a developmentally appropriate manner due to mental injury."

Josephine argues that the evidence shows that Ashley was attending school and "doing well socially." She points out that although Ashley claimed to have experienced dramatic weight changes, the evidence only "demonstrated a very modest weight gain over several months." Josephine contends that while the evidence might show that Ashley was "anxious and very unhappy," it does not support the superior court's finding that Ashley had suffered mental injury.

OCS responds that the superior court did not err in finding that Ashley suffered mental injury as a result of Josephine and Jacob's conduct and the conditions they created in their home, because that finding is supported by extensive evidence. OCS points out that Dr. Cranor testified that Ashley's lack of a substantial weight change does not alter her opinion of the potential health implications of Ashley's eating patterns. OCS notes that Dr. Cranor's primary concern was not Ashley's weight gain, but rather "the level of [Ashley's overall] symptomology," which includes "unhealthy eating and sleeping habits, an inability to concentrate, and unhealthy" levels of anxiety. OCS also observes that Edward Fitzpatrick testified that Ashley's ability to get good grades does not affect his opinion that she suffered mental injury. OCS concludes that the evidence shows that neither Ashley's slight weight gain nor her academic performance "affected Dr. Cranor's or Fitzgerald's overall opinion that Ashley suffered mental injury as a result of conditions in the family home."

██ We review factual findings for clear error.[28] Factual findings are clearly erroneous when, based on the entire record, we are left "with a definite and firm conviction that a mistake has been made."[29] We give particular deference to the trial court's factual findings when, as here, they are based primarily on oral testimony, because the trial court, not this court, judges the credibility of witnesses and weighs conflicting evidence.[30]

For CINA purposes, in order to find that a child has suffered mental injury the superior court must find that the child has suffered an "observable and substantial impairment in the child's ability to function in a developmentally appropriate manner."[31] Evidence

---

**26.** *Rick P.*, 109 P.3d at 952, 955.

**27.** *Id.* at 955–56.

**28.** *Winston J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 134 P.3d 343, 345–46 (Alaska 2006) (citation omitted).

**29.** *Alden H. v. State, Office of Children's Servs.*, 108 P.3d 224, 228 (Alaska 2005) (quotation omitted).

**30.** *In re Adoption of A.F.M.*, 15 P.3d 258, 262 (Alaska 2001).

**31.** AS 47.17.290(9). AS 47.10.990(20) states that "mental injury" has the same meaning in the CINA statutes as it does in AS 47.17.290.

of this impairment must be supported by the opinion of a qualified expert witness.[32] In this case the superior court found that Ashley has suffered "an observable and substantial impairment in [her] ability to function in a developmentally appropriate manner," as supported by the opinion of Dr. Cranor, a qualified expert in psychology. The trial court's findings are not clearly erroneous.

At the December 2005 temporary custody hearing before Master Bachelder, Ashley testified that if the children did not do their chores they were yelled at or spanked. She testified that in the past the children had been kicked and that Jacob had threatened to severely beat them. Ashley also testified about Josephine and Jacob's disciplinary methods, which included what she called the "leaning rest," in which the children were forced to hold a push-up position while being swatted with a wooden paddle. Ashley testified that she did not feel safe at home when Josephine and Jacob were mad or upset. Master Bachelder found Ashley to be a credible witness.

Master Bachelder ultimately found, after the conclusion of the December 2005 temporary custody hearing and the May 2006 combined adjudication and disposition hearing, that "the children had been subjected to a chronic, pervasive climate of fear in the mother's home, and that they were routinely threatened, yelled at, shamed, humiliated, verbally assaulted, bullied and physically abused." As a result, Master Bachelder found Ashley to be a child in need of aid under AS 47.10.011(8)(A). The superior court adopted this finding, stating that Ashley is a child in need of aid because she suffered "an observable and substantial impairment in [her] ability to function in a developmentally appropriate manner."

The superior court's finding is supported by Dr. Cranor's testimony. At the May 2006 combined adjudication and disposition hearing Dr. Cranor testified:

Q: Were you able to obtain enough information through your contact with [Ashley] and your other information to come to any conclusions about wheth-

er or not [Ashley] has suffered . . . an observable and substantial impairment in her ability to function in a developmentally appropriate manner?

A: What I observed about [Ashley] is that she certainly was exhibiting a number of symptoms of anxiety which were above [ ] what would be considered normal reactions, anxiety reactions, she was having some fairly marked difficulties with her eating patterns. She was having difficulties with her sleeping patterns, she was having difficulty concentrating, and all of those things were affecting her ability to do fairly normal things including complete her home-schooling schoolwork, get along with others, have fun, you know, relax, pay attention, learn things.

. . . .

And I think . . . you have to understand that everybody experiences the things we call anxiety, the feeling we call anxiety and when we look at it clinically, we look at [it] in terms of a continuum from what we consider normal anxiety. You know, when a person goes into a new situation that they don't know what to expect, it's normal to feel a little anxious because you don't know what's going to happen, and it progresses then to the kind of anxiety that interferes with a person's ability to take care of their daily living, to do the tasks they need to do, to think clearly, and so, you know, it appeared that while [Ashley's] anxiety was related to what was going on in the family, it had reached the point where it was somewhat disabling to her, not only just in terms of her ability to function, but also the point where, you know, there might be some health implications for it.

Josephine argues that Dr. Cranor's testimony does not support the superior court's finding because Ashley's medical records demonstrate that she experienced only a modest weight gain. But as OCS points out, Dr. Cranor did not base her opinion of Ashley's mental health on the notion that Ashley

---

**32.** AS 47.17.290(9).

had suffered a weight gain. Instead, she testified that Ashley had fairly marked "difficulties with her eating patterns" that were symptomatic of her abnormal levels of anxiety. According to Dr. Cranor, this anxiety interfered with Ashley's ability to function in a developmentally appropriate manner. In light of Dr. Cranor's testimony in finding that Ashley had suffered serious mental injury, the trial court's findings are not clearly erroneous.

## IV. CONCLUSION

Because the superior court applied the CINA statutes almost verbatim to the facts of this case, it did not use an incorrect legal standard when it adjudicated Ashley a child in need of aid. Also, because the superior court's factual findings are supported by Dr. Cranor's testimony, as the CINA statutes require, they are not clearly erroneous. We therefore AFFIRM the superior court's determination that Ashley was a child in need of aid.