*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| THERESA L., | ) | |
| | ) | Supreme Court No. S-15622 |
| Appellant, | ) | |
| | ) | Superior Court Nos. 3PA-11-00110/ |
| v. | ) | 00111 CN |
| | ) | |
| STATE OF ALASKA, | ) | O P I N I O N |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | No. 7029 – August 7, 2015 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Eric Smith, Judge.

Appearances: Julie Fields, Contract Attorney for the Public Defender Agency, Anchorage, for Appellant. Ruth Botstein, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

STOWERS, Justice.

## I.      INTRODUCTION

A mother appeals the termination of her parental rights to her two youngest children; the children are now teenagers and testified that they did not want her rights to be terminated. The trial court decided that the children were in need of aid because of

mental injury and that termination was in the children's best interests. The mother argues that the Office of Children's Services (OCS) did not meet its burden of proving mental injury and that the trial court clearly erred in deciding that termination was in the children's best interests because of their ages, their stated wishes, and their lack of a permanent placement. We issued an order reversing the trial court's decision because OCS presented insufficient evidence that the children suffered a mental injury.[1] This opinion explains our reasoning.

## II. FACTS AND PROCEEDINGS

Theresa L.[2] is the mother of Alicia, Maia, and Zane.[3] Alicia is now over 18; Theresa's parental rights to her were not terminated. At issue in this appeal is the order terminating Theresa's parental rights to Maia, who is currently 16, and Zane, now 14.[4]

Theresa lived in Wasilla for many years before leaving Alaska for Arizona in October 2011; she currently resides in Texas. In February 2011 Alaska State Troopers came to the family's home "regarding a domestic disturbance" between Theresa and Alicia. According to the emergency petition filed in the younger children's case, Theresa had contacted the Troopers because of Alicia's "behaviors." The Troopers reported "that the disturbance had not escalated to the point of becoming physical." The Troopers called OCS because Alicia "was adamant that she didn't want to stay at the home." Theresa agreed that Alicia could leave, and Theresa knew of "no other safe place[]"

---

[1]  *Theresa L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* No. S-15622 (Alaska Supreme Court Order, Jan. 26, 2015).

[2]  We use pseudonyms to protect the family's privacy.

[3]  Theresa has another child, Julianne, who was 20 at the time of the termination trial.

[4]  The children's fathers did not participate in the trial; their cases were severed at the beginning of the trial.

where Alicia could go. Because neither Theresa nor Alicia was "willing or able" to create a protective action plan, OCS took custody of Alicia and placed her at a youth shelter. Alicia remained in OCS custody throughout the pendency of the younger children's cases, and OCS initially included her in the termination petition.[5]

At the time OCS took custody of Alicia, Theresa's mother, Janet, was living with the family. Janet had been convicted of a sex offense in another state about 20 years before Alicia was taken into custody. Janet has not been charged with or investigated for any sex offenses since then. An OCS worker interviewed Maia and Zane separately at school about a month after the incident with Alicia, and they told the worker that their grandmother was living in the household. OCS did not remove Maia or Zane from the home then and did not open a case for them.

Theresa began to plan a move to Arizona at some point after OCS took custody of Alicia. OCS was aware that Theresa was planning to move to Arizona and had talked about a possible visit between Alicia and Theresa in Arizona after the move. Theresa sent Maia and Zane to Arizona with Janet in the summer; she planned to move there after Alaska Permanent Fund Dividends were distributed. According to an OCS worker, OCS did not have custody of or an open case on Maia or Zane then, nor did it tell Theresa that the children had to remain in Alaska; nonetheless, OCS considered her sending the children to Arizona "unauthorized" because the worker thought there was "an agreement for the two younger children to be in her home, and for them to be in a safe environment with her."

---

[5] At the time of the termination trial, Alicia was 17 and did not want her mother's parental rights to be terminated. During the termination trial the parties reached an agreement that Alicia would be placed either in a guardianship or an Adult Plan Living Arrangement.

In Arizona the children lived with Janet and Theresa's brother Jake. Jake was alleged to have sexually abused Maia and Alicia in 2003. At the time of the allegations Theresa took the girls for an evaluation and reported the incident to police.[6] No action was taken against Jake based on the allegations, and no allegations have been made against him since then. Theresa severed ties with Janet and Jake for a number of years because of the allegations, but she later resumed communications with them.

In September 2011 OCS contacted its counterpart in Arizona, and Arizona removed the children from Janet's and Jake's care. Arizona and OCS filed nearly simultaneous petitions for emergency custody of Maia and Zane at that time. The children were placed in foster care in Arizona, and courts in both Alaska and Arizona held jurisdictional hearings. Theresa moved up her departure date from Alaska and arrived in Arizona at about the time of the jurisdictional hearing in Arizona. Arizona decided that Alaska was the children's "home state" under the Uniform Child Custody Jurisdiction and Enforcement Act[7] and transferred custody of them to Alaska because the Alaska court did not decline jurisdiction.[8] The children were returned to Alaska and placed in foster care; Theresa remained in Arizona. She testified at the termination trial

---

[6] The report to OCS about the incident was "screened out," and OCS took no action at the time.

[7] UNIF. CHILD CUSTODY JURISDICTION & ENFORCEMENT ACT § 102(7), 9 U.L.A. Part IA 658 (1999). Both Alaska and Arizona have adopted versions of the Uniform Child Custody Jurisdiction & Enforcement Act. AS 25.30.300-.910; ARIZ. REV. STAT. §§ 25-1001 to -1067 (2015).

[8] Theresa has not asked us to review the trial court's decision not to decline jurisdiction. We note that we question why the Alaska court would elect to retain jurisdiction when the children, their mother, grandmother, and uncle were all located in Arizona at the time.

that although she had the money to buy a return ticket to Alaska, she did not have enough money to establish herself here again at that time.

Theresa remained in the general geographic area where her mother and brother lived for approximately a year, but she did not live with her family because of OCS's concern about them. While there Theresa met and became romantically involved with a woman named Tracy, who had two children of her own. Theresa and Tracy moved to Texas because Tracy was offered a job there; Theresa also felt that Texas offered better financial opportunities for her.

After Theresa moved to Texas she received a settlement from a personal injury lawsuit. Using this money Theresa purchased a home in Texas, where she was residing at the time of the termination trial.[9] At the time of the trial Theresa was a lead teacher at a preschool, and she and Tracy were no longer living together because Theresa's children had expressed to her that they were uncomfortable with the idea of living with Tracy and her children.

Theresa completed a psychological evaluation with Dr. Melinda Glass on one of her visits to Alaska. Theresa attended individual therapy in both Arizona and Texas; she saw an individual counselor in Texas roughly once a month, for a total of 13 times in 16 months. She also attended family therapy with Zane and Maia, mostly by phone, although she attended sessions in person when she was in Alaska for visits. Theresa missed or was late to several sessions with Zane and Maia, and the counselor terminated family therapy with Theresa on December 4, 2013. At the time of the termination trial, Zane was no longer in counseling, and Maia was in counseling because she "wanted to talk more individually" with the counselor.

---

[9] One component of Theresa's case plan was that she have suitable, stable housing.

OCS was interested in placing the children with Theresa in Texas and put off termination efforts to explore that option. But OCS took the position throughout the case that it could not place the children with Theresa in Texas unless Texas approved placement under the Interstate Compact on the Placement of Children (ICPC); at the termination trial, an OCS worker agreed that "if there were no ICPC requirement, reunification would still be on the table."[10] OCS requested two home studies, and Texas denied placement both times.

OCS petitioned to terminate Theresa's rights to Alicia, Maia, and Zane in March 2013, alleging that the children were in need of aid under AS 47.10.011(5) (refusal to return home) and (8) (mental injury).[11] After a continuance at OCS's request, the court held a termination trial in February and March 2014. Zane and Maia were represented by counsel at the trial. A number of witnesses testified at the trial: three OCS social workers; Bradley Ohs, the children's counselor; George Gomez, Theresa's counselor; Dr. Glass, a psychologist; and Theresa, Zane, and Maia.

Only Ohs and Dr. Glass were qualified as experts: Ohs was qualified as an expert in individual and family counseling, and Dr. Glass was qualified as an expert in

---

[10]    As OCS notes in its appellate brief, there is a split in authority from other states whether the ICPC applies to parental placements. In this case the trial court said that the ICPC had no effect on its decision to terminate Theresa's parental rights, so the applicability of the ICPC to a parental placement is not an issue on appeal.

[11]    It appears that subsection .011(5) applied only to Alicia because there is no indication that Maia and Zane were refusing to return to Theresa's custody. They both testified at the termination trial that they wanted to live with her. AS 47.10.011(8) has several subsections that have slightly different elements; the petition did not specify which part of .011(8) OCS was using. The termination order cites .011(8)(A) because in its closing statement OCS asked the court to use that statutory subsection.

"performing psychological evaluations." Dr. Glass never evaluated the children.[12]

Ohs testified about his observations of the family and the counseling he had provided, and he discussed why he had terminated family therapy with Theresa. Ohs expressed concern about "poor boundaries" in the family. He gave several examples of what concerned him. In a family therapy session in May 2012, which was the first time Theresa returned to Alaska to participate in face-to-face counseling with the children, Alicia became tearful upon hearing her siblings explain how they felt about their life in their foster home, and Zane "licked her on the face from her cheek all the way up her nose and eye" to make Alicia feel better. The family reacted by laughing, and, according to Ohs, "They shared with [him] that this was a common practice in their home, that they would lick each other on the face . . . to cheer each other up."[13] Ohs also testified that Zane, who was ten at the time, had "demonstrated really poor personal boundaries" in the same session by engaging in baby talk and putting his head "right on [his mother's] chest just like an infant would, hugging her." Ohs acknowledged that Zane's clinginess was "a natural occurrence for a kid who hasn't seen [his] mother," but he felt Zane's behavior, and Theresa's allowing it, showed "poor personal boundaries." According to Ohs, in the same therapy session, Zane sang a song about a "butt factory" and "was dancing and shaking his butt inappropriately." Ohs criticized Theresa for not counseling Zane about "pushing limits." Ohs also testified that the prognosis for reunification was "poor" because of the distance between Theresa and the children but that the "prognosis

---

[12]     The transcript reflects that an OCS worker did a psychological assessment of the children in 2011, shortly after their return from Arizona. Notwithstanding that both children waived any privilege related to this assessment, the assessment was not entered into evidence at trial.

[13]     The notes from the session indicate that Alicia said this.

could be enhanced some" if the children lived near Theresa. Ohs said that it would not be in the children's best interests to cease all contact with Theresa.

Gomez testified about his treatment of Theresa in Texas. He agreed Theresa had made "substantial improvements" and that she "could be a safe and effective parent right now." Gomez deferred to Ohs's opinion about whether the children were ready to be reunified with Theresa, but he felt "pretty confident" about Theresa's progress. He said he would be willing to work with the family if the children moved to Texas.

Dr. Glass discussed her May 2012 psychological evaluation of Theresa, whom she had diagnosed with dysthymic disorder and dependent personality disorder. She did not think the treatment Gomez had provided was adequate to address her concerns; she thought he should have seen Theresa more frequently. Dr. Glass testified that she did not think Theresa was ready to parent the children at the time of the evaluation, but she acknowledged she had not seen Theresa in two years. Dr. Glass had never seen the children.

The principal OCS social worker in the case, Cynthia Robinson, testified about Theresa's case plans and efforts made with respect to them. She testified that the children were taken into custody because Theresa left them with Janet and Jake in Arizona and that OCS was still concerned about the possible involvement of these family members in the children's lives. She agreed that if there were no ICPC requirement, reunification with Theresa "would still be on the table." She also agreed that Zane and Maia were "pretty good kids" and that "they've always been pretty good, well-rounded kids." Robinson could not recall having identified any special needs for Maia or Zane. She testified that Maia is "a really sweet, sweet kid" who "does well in school" and is "well-rounded." She described Zane as "easy going," a "goes with the flow kind of a

kid" and agreed that Zane's characteristics had not "changed considerably" since OCS assumed custody of him.

Robinson also testified about placement efforts and the concerns she had about the foster home where the children were then placed: she agreed that one of her concerns was "that the [foster] home [was] consistently dirty" and testified that the children did not feel a sense of belonging. She said that placement in that foster home was originally done "in an emergency situation" and that she had been looking for about a year but had not been able to find another placement. Robinson said she "wouldn't expect" Zane and Maia to be open to adoption at that time and indicated that she did not talk to them about it because it upset them and because she "wouldn't want to talk to them about being adopted when [she didn't] even have somebody that they have established a relationship with." Robinson also said she would "[r]ecommend, to a degree," that the children have continuing contact with Theresa if Theresa's parental rights were terminated. She acknowledged that the children could and would contact their mother if they wanted to, through Facebook or other electronic means.

Zane and Maia both testified that Theresa was concerned about their grades, talked to them about their school and activities, and disciplined them when they were living with her by grounding them, removing electronics or desserts, or sometimes spanking them. Neither of them voiced any concerns about her care of them except that they had moved a lot. Zane described his removal in Arizona, testifying that once he realized the authorities were there to take him into custody, he hid in a closet while they searched for him. He denied that licking Alicia's face was a sexual gesture, saying it was "gross" and made his family laugh. Both children testified that they wanted to live with their mother, although Maia was somewhat uneasy about leaving Alaska. They testified about their grades, and both indicated that they talked to Theresa frequently on the phone. Zane testified that he had only gotten one F the whole time he lived with

Theresa, and at the time of the termination trial he had one or maybe two Fs. Maia testified that she had generally gotten As and Bs on her report card. The children testified that Theresa monitored their grades and their friends, and Zane testified about restrictions Theresa placed on him when his grades were bad. Both children denied any abuse or other problems with their uncle or grandmother in Arizona. Maia testified that she did not like Robinson's attitude toward Theresa. Both children said they would not consent to an adoption by anyone other than their sister Julianne or, in Zane's case, "family."

Theresa testified about her life after she left Alaska, her counseling, Janet and the resumption of contact with her, the sex abuse allegations against Jake, the difference between parenting Alicia and the other children, the number of times she moved while in Alaska, her relationship with Tracy, and her financial situation.

OCS, Theresa, and the children submitted proposed written findings as their closing statements. OCS's proposed findings asked the court to find that the children were in need of aid under AS 47.10.011(7) (sex abuse)[14] and .011(8)(A) (mental injury).

In its termination order, the trial court decided that OCS had not met its burden of proving that the children were in need of aid under .011(7) because "there is no evidence of any abuse" since the allegations against Jake occurred ten years earlier. The court also declined to consider the guardian ad litem's argument, made in her written closing, that the children were in need of aid under .011(11) (parental mental illness); the trial court observed that "this subsection was not alleged by OCS in its termination petition or addressed in its closing argument." The court decided that OCS had shown by clear and convincing evidence that the children were in need of aid under

---

[14]     A large part of the trial was related to OCS's concerns about Janet and Jake, even though OCS did not allege sex abuse as a basis for termination in its petition.

AS 47.10.011(8) (mental injury), relying on Zane's diagnosis of post-traumatic stress disorder (PTSD),[15] the children's "boundary issues," and their "behavior."[16]  It also found that termination was in the children's best interests, but it ordered post-termination contact between the children and Theresa because Ohs had testified that cutting off contact between the children and Theresa would not be in their best interests.

Theresa moved for reconsideration, arguing that the court failed to consider less drastic alternatives to termination, failed to address two issues — whether the ICPC applied to parents and whether the reasons for Texas's denial of placement would warrant termination — and had erroneously relied on facts not established in the record. The children joined in their mother's request, and the court ordered the other parties to respond.  OCS and the guardian ad litem opposed reconsideration.

The court denied reconsideration, explaining that it did not reach the ICPC issue because it "did not rely on Texas'[s] reasons in deciding that [Theresa's] rights should be terminated."  The court further stated that neither guardianship nor an Adult Plan Living Arrangement would "give the children any permanency at this point," but that both options were still available in the future.  The court said that "leaving the children in limbo regarding the status of their relationship with their mother [was] not in [their] best interests."  The court refused to set out specific post-termination contact between the children and Theresa, reiterating that "[t]here can be no question that some

---

[15]    Ohs did not testify about the origin of Zane's diagnosis or why Ohs entered the diagnosis on therapy notes related to Zane.

[16]    In its order, the trial court noted that OCS and the guardian ad litem relied on AS 47.10.011(8)(A).  The trial court found that the children suffered mental injury, not that they were at risk of suffering mental injury as a result of "a pattern of rejecting, terrorizing, ignoring, isolating, or corrupting behavior that would, if continued, result in mental injury," see AS 47.10.011(8)(B)(i), so it appears that the order was made under .011(8)(A) rather than .011(8)(B)(i).

contact would be in their best interests." In response to the evidentiary issues Theresa raised, the court explained that Zane's PTSD diagnosis was "only one part of the court's finding — the key pieces were the inappropriate boundaries found by Mr. Ohs with respect to both children and the children's negative behaviors after they spent time with their mother." The court said the incident in which Zane licked Alicia's face applied to Maia because "neither child seemed to believe that this behavior was inappropriate." Theresa appeals.

## III. STANDARD OF REVIEW

Whether a child is a child in need of aid and whether termination is in the child's best interests are factual questions that we review for clear error.[17] A finding is clearly erroneous if we are left with a definite and firm conviction that the trial court made a mistake.[18] Whether factual findings satisfy the requirements of the applicable child in need of aid (CINA) statute is a question of law that we review de novo.[19] We interpret statutes using our independent judgment.[20] "We bear in mind at all times that terminating parental rights is a drastic measure."[21]

---

[17] *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 948-49 (Alaska 2013) (citations omitted).

[18] *Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 246 P.3d 916, 920 (Alaska 2011) (citation omitted).

[19] *Id.* (citation omitted).

[20] *Louie v. BP Exploration (Alaska), Inc.*, 327 P.3d 204, 206 (Alaska 2014) (citation omitted).

[21] *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 428 (Alaska 2012) (citation omitted) (internal quotation marks omitted).

## IV. DISCUSSION

### The Finding That The Children Were In Need Of Aid Under AS 47.10.011(8)(A) Was Clearly Erroneous.

Theresa argues that OCS did not meet its burden of showing that the children were in need of aid under AS 47.10.011(8)(A). She maintains that there was no evidence that the children suffered a "mental injury" as the legislature defined it because there was no expert testimony that they had suffered an "observable and substantial impairment in [their] ability to function in a developmentally appropriate manner"[22] due to her conduct. Theresa points out that no evidence showed that Maia "had a mental health diagnosis, a serious mental injury, or an inability to function in a developmentally appropriate manner." Theresa acknowledges that Ohs's testimony "tend[ed] to show that Zane lacked an understanding of personal boundaries at the beginning of therapy," but she contends that "this lack of insight does not comport with the specialized definition of 'mental injury' in the context" of CINA cases.

OCS counters that Ohs's observation of Zane's behavior when Zane engaged in baby talk, clung to Theresa, and put his head on her chest during a visit with her early in the case is evidence of mental injury. OCS points to testimony from Ohs that Maia showed "more insight and maturity" than Theresa in therapy as well as displaying "parentified" behavior in reminding Theresa of counseling sessions. OCS also relies on Ohs's observation of the children's "deteriorating behavior" in therapy sessions when Theresa visited as an indicator of mental injury. OCS contends that no specific diagnosis is needed to prove that a child has suffered a mental injury under the statute.

Alaska Statute 47.10.011(8)(A) provides that a child is in need of aid if the child has been subjected to "conduct by or conditions created by the parent . . . [that]

---

[22]    AS 47.17.290(10).

have . . . resulted in mental injury." For purposes of the CINA statutes, "mental injury" is defined as "a serious injury to the child as evidenced by an observable and substantial impairment in the child's ability to function in a developmentally appropriate manner and the existence of that impairment is supported by the opinion of a qualified expert witness."[23] At a termination trial, OCS must prove that a child is in need of aid by clear and convincing evidence.[24] Clear and convincing evidence is "evidence that is greater than a preponderance, but less than proof beyond a reasonable doubt";[25] it "is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved."[26]

As discussed below, we have considered whether evidence supports a finding of "mental injury" in a number of cases, and we have decided that gross parental misconduct is not needed for a finding of mental injury.[27] Here, Theresa challenges the adequacy of the trial court's findings to satisfy the statutory standard for "mental injury" as well as the accuracy of those findings, so we first consider what level of impairment the legislature intended when it defined "mental injury."

---

[23] AS 47.10.990(21); AS 47.17.290(10).

[24] *Sherman B.*, 290 P.3d at 428 (citation omitted).

[25] *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 187 (Alaska 2009) (quoting *Buster v. Gale*, 866 P.2d 837, 844 (Alaska 1994)) (internal quotation marks omitted).

[26] *Id.* (quoting *Buster*, 866 P.2d at 844) (internal quotation marks omitted).

[27] *Josephine B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 174 P.3d 217, 220-22 (Alaska 2007).

We interpret a statute according to reason, practicality, and common sense, taking into account the statute's language, its legislative history, and its purpose.[28] The CINA statutes are to be construed consistently with the goal of "promot[ing] the child's welfare and the parents' participation in the upbringing of the child to the fullest extent consistent with the child's best interests."[29]

The CINA statute defines "mental injury" as "a serious injury to the child as evidenced by an observable and substantial impairment in the child's ability to function in a developmentally appropriate manner and the existence of that impairment is supported by the opinion of a qualified expert witness."[30] As we said in *Josephine B. v. State, Department of Health & Social Services, Office of Children's Services*, the text of the statute limits CINA jurisdiction to cases in which parental conduct causes "substantial mental injuries."[31] The legislature's choice of words demonstrates this limitation. "Serious" means "[g]rave in quality, character, or manner: SOBER" or "[i]nvolving important rather than trivial matters: WEIGHTY."[32] "Observable" is defined as "deserving of observation: NOTEWORTHY" or "capable of being observed: DISCERNABLE, DETECTABLE, NOTICEABLE."[33] An "impairment" is "the act of impairing

---

[28] *Louie v. BP Exploration (Alaska), Inc.*, 327 P.3d 204, 206 (Alaska 2014) (citation omitted).

[29] AS 47.10.005(1).

[30] AS 47.10.990(21); AS 47.17.290(10).

[31] 174 P.3d at 222.

[32] WEBSTER'S II NEW COLLEGE DICTIONARY 1032 (3d ed. 2005).

[33] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1558 (1966).

or the state of being impaired: INJURY . . . DETERIORATION."[34] "Substantial" has a number of meanings, including "[o]f, relating to, or having substance: MATERIAL" and "[b]eing of considerable importance, value, degree, amount, or extent."[35] "Developmentally" in this context is related to "develop" and its meaning "[t]o progress from earlier to later stages of individual maturation."[36] The plain meaning of the statutory language thus indicates that for a mental injury to confer CINA jurisdiction, it must be significant and must noticeably impact the child's functioning.

The legislative history is consistent with this reading of the statute. The mental injury subsection of the CINA statute was enacted in 1998 to bring Alaska's CINA statutes into compliance with federal standards.[37] In its original form the legislation would have permitted a finding that a child was in need of aid when conduct or conditions created by the parent "resulted in emotional harm to the child," which could be "indicated by observable impairment in the child's functioning or development, including failure to thrive, extreme anxiety, depression, withdrawal, or aggressive or hostile behavior toward self or others."[38] "Emotional harm" in the original bill "includ[ed] 'mental injury' as defined in AS 47.17.290."[39] Minutes from a hearing in the House Health, Education and Social Services Committee reflect that Susan Wibker, an assistant attorney general, discussed "emotional harm," saying that these cases "come

---

[34]     *Id.* at 1131.

[35]     WEBSTER'S II NEW COLLEGE DICTIONARY 1126 (3d ed. 2005).

[36]     *Id.* at 316.

[37]     *Josephine B. v. State, Dep't of Health & Social Servs., Office of Children's Servs.*, 174 P.3d 217, 220-21 & n.14 (Alaska 2007).

[38]     House Bill (H.B.) 375 § 28, 20th Leg., 2d Sess. (1998).

[39]     *Id.* § 48.

into the system as emotional neglect where you have a parent not getting care for a child that's maybe hostile, aggressive or suicidal and what happens is the child gets the treatment they need and you find out that this child's condition is not going to change or get better unless something changes at home."[40]

The bill was amended by the House Health, Education and Social Services Committee;[41] the amended version changed "emotional harm" to "mental injury" and provided that "mental injury" had "the meaning given in AS 47.17.290."[42] In comments at a Senate Judiciary Committee hearing, Ms. Wibker indicated that the change was made "to tighten and narrow it to very severe situations."[43] At the same hearing the Deputy Commissioner of Health and Social Services told the committee that the definition was narrower than that of most other states.[44] According to the minutes, Representative Fred Dyson, the bill's sponsor, told the Senate committee that "they struggled with the agency, starting with 'emotional harm' and ended up with the more conservative 'mental

---

[40] Minutes, House Health, Educ. & Soc. Servs. Comm. Hearing on H.B. 375, 20th Leg., 2d Sess. No. 2287 (Mar. 5, 1998) (testimony of Susan Wibker, Assistant Attorney Gen.).

[41] There were further changes to the bill, including the addition of subsection .011(8)(B) in the House Finance Committee, *see* Committee Substitute for House Bill (C.S.H.B.) 375(FIN) § 19, 20th Leg., 2d Sess. (1998), but we confine our discussion to the definition of "mental injury."

[42] C.S.H.B. 375(HES) §§ 31, 57, 20th Leg., 2d Sess. (1998).

[43] Minutes, Sen. Judiciary Comm. Hearing on C.S.H.B. 375(FIN) am, 20th Leg., 2d Sess. No. 420 (May 8, 1998) (testimony of Susan Wibker, Assistant Attorney Gen.).

[44] *Id.* (testimony of Russell Webb, Deputy Comm'r of Dep't of Health & Soc. Servs.).

injury.' They argued over when mental injury raises it to the level of a child in need of aid."[45]

As we noted above, in the original bill "emotional harm" could be "indicated by observable impairment in the child's functioning or development, including failure to thrive, extreme anxiety, depression, withdrawal, or aggressive or hostile behavior toward self or others."[46] Use of the word "include" means that the list was not exclusive and that other conditions could meet the definition,[47] but the types of impairments listed in the original bill language are significant problems, demonstrating an intent to limit mental injury to difficult mental or behavioral problems.[48] A legislative intent to *narrow* the circumstances in which mental injury applied by using the definition in AS 47.17.290 indicates that a finding that a child has suffered a mental injury requires that the child exhibit at a minimum some serious overt emotional or behavioral problem.

Looking at cases in which we have reviewed findings of mental injury under AS 47.10.011(8), we observe that the children involved had either mental health diagnoses, significant behavioral difficulties, or both. For example, we upheld a finding of mental injury when a child "showed disturbing behavior" during his initial removal (when he was four to five years old) such as "choking a cat, killing a pet duck, [and] fondling his foster mother," and later exhibited more disturbing behaviors after being returned to his father's care, "including an incident in which [the child] shoved a girl's

---

[45]     *Id.* (statement of Rep. Fred Dyson).

[46]     House Bill (H.B.) 375 § 28, 20th Leg., 2d Sess. (1998).

[47]     *Thoeni v. Consumer Elec. Servs.*, 151 P.3d 1249, 1258 (Alaska 2007) (citations omitted).

[48]     *See Adamson v. Municipality of Anchorage*, 333 P.3d 5, 20 (Alaska 2014) (citation omitted) (construing a statute by looking at items on a list to identify a class to which the items belong).

head into his crotch."[49]  In another case we affirmed a finding of mental injury when the child had been diagnosed with reactive attachment disorder and "severe Oppositional Defiant Disorder," and the trial court found that the child suffered from a number of problems, including "cognitive delays, . . . anger and aggressive outbursts."[50]  In *Josephine B.* we affirmed an adjudication decision because the child's therapist testified that the child's anxiety was causing her to have "marked difficulties with her eating patterns" as well as difficulties with her sleeping patterns and difficulty concentrating, all of which were affecting the child's ability to do schoolwork and interact well with others.[51]  And in an unreported decision, we affirmed a finding of mental injury because the child's therapist testified that the father's "failure to follow OCS's visitation rules caused [the child] severe anxiety, manifested by physical symptoms."[52]

In its appellate brief OCS relies on *Martha S. v. State, Department of Health & Social Services, Office of Children's Services*, where we affirmed, using the preponderance of the evidence standard, an adjudication finding under

---

[49]  *Rick P. v. State, OCS*, 109 P.3d 950, 952-53 (Alaska 2005).

[50]  *Ralph H. v. State, Dep't of Health & Social Servs., Office of Children's Servs.*, 246 P.3d 916, 923-24 (Alaska 2011) (internal quotation marks omitted); *see also V.S.B. v. State, Dep't of Health & Social Servs., Div. of Family & Youth Servs.*, 45 P.3d 1198, 1201-02, 1204-05 (Alaska 2002) (affirming finding that children were in need of aid due to mental injury when all four children acted aggressively and two of the children displayed inappropriate sexual behavior).

[51]  *Josephine B. v. State, Dep't of Health & Social Servs., Office of Children's Servs.*, 174 P.3d 217, 223-24 (Alaska 2007).

[52]  *Wystan Z. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Mem. Op. & J. No. 1501, 2014 WL 2716672, at *3 (Alaska June 11, 2014).

AS 47.10.011(8).[53] *Martha S.*, like this case, involved two children, Andy and Allie, and we considered the mental health of each child separately.[54] Andy had multiple mental health diagnoses and significant behavior problems at school, and had to be hospitalized at North Star; we affirmed the finding that he had suffered a mental injury.[55] As to Allie, we stated that she "currently displays mental injury as evidenced by her sexual reactivity and is at risk of suffering future mental injury as a consequence of inadequate supervision and a hostile home environment."[56] Testimony about Allie's "sexual reactivity" included detailed information Allie had related to her therapist about sex abuse in the home as well as the foster parent's and the therapist's observations of Allie's sexualized behavior.[57] The children's hostile home environment included a father who isolated the family from social services, had threatened to kill OCS workers, and was charged with trying to run over an OCS worker in the courthouse parking lot.[58] In the appeal from the termination order about the same children, we affirmed the trial court's finding that Allie had suffered mental injury as defined in the statute.[59] We noted that Allie's mental health diagnosis was adjustment disorder, which her therapist described as "benign," but that the therapist also testified that Allie's "sexual reactivity" impaired

---

[53]    268 P.3d 1066, 1080, 1084 (Alaska 2012).

[54]    *Id.* at 1081-82.

[55]    *Id.* at 1069-70, 1081.

[56]    *Id.* at 1082.

[57]    *Id.* at 1072.

[58]    *Id.* at 1068-69, 1072-73.

[59]    *William S. v. State, Dep't of Health & Social Servs., Office of Children's Servs.*, Mem. Op. & J. No. 1474, 2014 WL 199882, at *8 (Alaska Jan. 15, 2014).

Allie's ability to function in a developmentally appropriate manner and that Allie's impairment had been substantial when she was taken into custody; we relied on this testimony, coupled with the lack of change in the family home, to affirm the finding that Allie was in need of aid because of mental injury.[60]

There is no comparable evidence here. In finding that the children suffered a mental injury, the trial court summarized Ohs's testimony[61] and found that the children had "suffered mental injury" due to "[Zane]'s diagnosis [of PTSD], the children's behavior, and the boundary issues discussed by Dr. Ohs."[62] On reconsideration, the court said that even if the PTSD were caused by Zane's removal rather than Theresa's conduct, "that entire situation was brought on by [Theresa] and the court found that removal was appropriate." The court further said that the PTSD was only part of the finding: "the key pieces were the inappropriate boundaries" and "the children's negative behaviors after they spent time with their mother." The court said that Zane's licking Alicia applied to both children because Maia did not see it as inappropriate. The court justified its reliance

---

[60]     *Id.* at *2, *8.

[61]     In its summary of the evidence, the court said that both Zane and Maia "exhibited . . . a pattern of sexually acting out in certain respects." We found nothing in the record to support this statement. Ohs testified that *Alicia* had acted out sexually in her foster placement, but he did not testify that Zane or Maia had a pattern of sexually acting out. OCS points to Ohs's opinion that the children were at risk for acting out sexually to support its contention that we should consider the children to be in need of aid under AS 47.10.011(8)(B)(i). In giving this opinion, Ohs relied on an incident, reported to him by an OCS worker, in which *Alicia* "straddled" Zane. The court sustained an earlier objection to his testimony about the report because it was hearsay. Nothing indicated that Maia had ever acted inappropriately, and it is not clear whether the trial court considered Zane's licking Alicia's face together with the report from the OCS worker to be a "pattern of sexually acting out," in spite of Zane's denial that licking Alicia had any sexual meaning.

[62]     Ohs was not a doctor, as the court acknowledged on reconsideration.

on Dr. Glass's testimony to find mental injury, even though Dr. Glass never saw the children, because Dr. Glass's observations assisted the court in evaluating Theresa's interactions with the children.

Turning first to Zane's PTSD diagnosis, OCS did not identify in its appellate brief any testimony about that diagnosis or its origin, and we found none. The only trial evidence we found suggesting that Zane had a diagnosis of PTSD were therapy notes from Ohs, where PTSD was listed as Zane's primary diagnosis.[63] Ohs did not testify at trial about his basis for making the diagnosis or its causes. The same therapy notes with Zane's PTSD diagnosis also consistently show a score of 80 on the global assessment of functioning (GAF) scale.[64] A GAF of 71 to 80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."[65] 80 is the high end of the scale from 71 to 80, so even if Zane's PTSD diagnosis was linked to Theresa's conduct, the only evidence showing the diagnosis also indicates that Zane had only a slight impairment in functioning, not that

---

[63]     One therapy note with Maia as the client is in the record; no diagnosis was entered on the note.

[64]     The earliest note in the record with Zane's diagnosis is from April 2012 and shows a GAF of 80.

[65]     AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS, FOURTH EDITION, TEXT REVISION (DSM-IV-TR) 34 (4th ed. 2000) (emphasis omitted). The GAF scale has been removed from the latest version of the DSM. *See* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS, FIFTH EDITION, DSM-5 16 (5th ed. 2013).

he was suffering "an observable and substantial impairment in [his] ability to function in a developmentally appropriate manner," as the statute requires.[66]

Theresa also points out, as she did when she moved for reconsideration, that no evidence linked Zane's diagnosis to her conduct. We agree. We found no evidence — and OCS points to none — establishing that the PTSD diagnosis was caused by Theresa's conduct or conditions created by her, as the CINA statute requires.[67] With respect to Zane's PTSD diagnosis, we hold that the trial court clearly erred in its finding that this was evidence of mental injury.

The other facts the trial court relied on to find mental injury included "the children's behavior" after visits with Theresa and "the boundary issues discussed by . . . Ohs." In summarizing the evidence, the court said that Zane and Maia "acted very poorly with their foster parents after sessions with their mother" and "were subject to an 'us versus them' mentality created by their mother." Theresa argues that these grounds are inadequate to support a finding of mental injury for CINA purposes. OCS sets out specific examples of behavior that it claims support the conclusion that the children had substantial impairments.

It is undisputed that Ohs testified about "poor boundaries," but OCS does not explain how the "poor boundaries" described by Ohs meet the statutory standard for mental injury. OCS relies primarily on Ohs's testimony that in one therapy session Zane "regressed" by using "some baby talk" and putting his head on his mother's chest, "just like an infant would, hugging her." Ohs did not testify that Zane repeatedly acted babyish when he was with Theresa, as OCS implies: the behavior he described happened

---

[66]    AS 47.17.290(10).

[67]    AS 47.10.011(8)(A).

at one session,[68] and the therapy notes from that session say that Zane was "markedly" clingy, "more so than the previous day." One instance of infantile behavior by a ten-year-old child is not "an observable and substantial impairment in [his] ability to function in a developmentally appropriate manner,"[69] particularly here, where Ohs also testified that Zane's clinging to his mother was "a natural occurrence for a kid who hasn't seen [his] mother."

In the termination order, the trial court identified Zane's licking Alicia's face as a "notabl[e]" example of poor boundaries. When describing other examples of "poor boundaries," Ohs testified that ten-year-old Zane sang a song about a "butt factory" and "was dancing and shaking his butt inappropriately" in a family therapy session. While Zane's behavior perhaps may have been inappropriate for family therapy, we cannot conclude that it rises to the level of severity the legislature contemplated in enacting the mental injury subsection of the CINA statute. More importantly, OCS points to no testimony that Zane or Maia were substantially impaired in their ability to function in a developmentally appropriate manner because of their "poor boundaries."

We found no evidence to support the trial court's statement that the children behaved poorly with their foster parents after family therapy with Theresa. As OCS notes, Ohs testified that the children were disruptive in a therapy session with Theresa; he said the children "laughed out of control, giggling [and] were disrespecting mom." Theresa was unable to settle them, and Ohs said that the following week, when Theresa was not with them, the children were much better behaved. As with Zane's singing and dancing, the behaviors Ohs described were not ideal, but neither do they demonstrate "an

___

[68] This therapy session took place in May 2012, during Theresa's first visit to Alaska after the children were removed. We observe that at the time of this session, ten-year-old Zane had not seen his mother for eight months.

[69] AS 47.17.290(10).

observable and substantial impairment in the child[ren]'s ability to function in a developmentally appropriate manner" that would justify terminating Theresa's parental rights. All of Zane's behaviors may just as easily be explained as the antics of a ten-year-old boy who, seeing his mother for the first time in eight months, was merely goofing off to get her attention.

OCS argues on appeal that Theresa made "unrealistic, inappropriate promises" about reunification and displayed "poor boundaries and poor decisionmaking in her parenting" and that the "poor boundaries" were key to the trial court's decision. With respect to the unrealistic promises, Ohs testified that Theresa had made unrealistic promises because she "was passionate about wanting to reunify" with the children; Ohs also said, in the portion of the transcript OCS cites, "And they were promises very early on in the case, the first month, that we needed to address and make sure that she did not make promises that were inappropriate based on her desire to have the children." In any event, this is evidence about Theresa, and it does not support a finding that *the children* were significantly impaired in their ability to function in a developmentally appropriate manner.

With respect to Maia, OCS points to Ohs's testimony that Maia exhibited parentified behavior and had better insight in therapy than Theresa.[70] The only example

---

[70] As we noted in *Grace L. v. State, Department of Health & Social Services, Office of Children's Services*, parentification "entails a functional and/or emotional role reversal in which the child sacrifices his or her own needs for attention, comfort, and guidance in order to accommodate and care for logistical or emotional needs of the parent." 329 P.3d 980, 985 n.12 (Alaska 2014) (quoting Nancy D. Chase, *Parentification: An Overview of Theory, Research, and Societal Issues*, in BURDENED CHILDREN: THEORY, RESEARCH AND TREATMENT OF PARENTIFICATION 3, 5 (Nancy D. Chase ed., 1999)) (internal quotation marks omitted). The same author cautions, "Because all families communicate parentifying messages to some degree to their
(continued...)

Ohs gave of Maia's parentified behavior was reminding Theresa of family therapy sessions. OCS also argues that Maia had a mental injury because she "already has trouble forming relationships." Theresa replies that OCS is exaggerating the testimony it relies on and that the testimony does not meet the standard for mental injury in any event. Ohs testified, "I've seen [Maia], in fact, pull back from relationships because she does not want to be like her mother, she's shared, and not get emotionally involved so quickly." We agree with Theresa that this testimony is inadequate to support a finding of mental injury.

The trial court found only that the children were in need of aid because they "suffered mental injury"; it did not make findings under other statutory subsections. OCS nonetheless asks us to affirm on the alternative ground that the children were in need of aid under AS 47.10.011(8)(B)(i), which requires a finding that the child has been placed at substantial risk of mental injury as a result of "a pattern of rejecting, terrorizing, ignoring, isolating, or corrupting behavior that would, if continued result in mental injury." OCS relies on *Martha S.*, where we affirmed an adjudication finding that a child was in need of aid because of the child's "sexual reactivity" and the child's home environment.[71] Theresa replies that in her case the trial court did not make the necessary findings under this statutory subsection and that it would be inappropriate for this court to make factual findings. She also distinguishes *Martha S.* factually, noting that the "hostile home environment" we described in *Martha S.* included a father who had uttered

---

[70]    (...continued)
children, discussions of parentification must distinguish carefully between benign and detrimental types and duration of parentified roles." Chase, *supra* at 6.

[71]    *Martha S. v. State, Dep't of Health & Social Servs., Office of Children's Servs.*, 268 P.3d 1066, 1082 (Alaska 2012).

death threats to OCS workers and isolated his family.[72]  As Theresa points out, no one testified that she engaged "in a pattern of rejecting, terrorizing, ignoring, isolating, or corrupting behavior."  Her children described their conversations with her as well as their family life with her before they were removed, and they expressed no fear of her or worries about living with her — they both told the court they wanted to live with her.  At trial Ohs expressed concerns about "personal boundaries" in the family, as OCS points out in its brief.  But his testimony does not come close to support for a finding of "a pattern of rejecting, terrorizing, ignoring, isolating, or corrupting behavior" by Theresa, and the trial court appropriately did not make such a finding.  And it is hard to see why Ohs would recommend continuing contact with Theresa, or why as late as the termination trial OCS would think reunification with Theresa "would still be on the table" but for the ICPC requirement, if she were engaging in this type of behavior.

Based on the statutory language and legislative history, which indicate that mental injury requires a significant or severe problem in functioning or behavior, we conclude that OCS did not meet its burden of showing by clear and convincing evidence[73] that either of these children suffered a mental injury as defined in the statute.  There was no evidence that they were depressed, extremely anxious, or withdrawn, nor was there evidence that either child exhibited aggressive or hostile behavior toward anyone.  In fact, the evidence presented at the termination trial indicated that these two children have done reasonably well in school and elsewhere, and were doing well before OCS intervened.  No evidence showed that Zane or Maia had any behavioral problems at school, and the behaviors that concerned Ohs were not severe or aggressive.  We discern no evidence that these children had any significant behavioral or emotional

---

[72]     *Id.*

[73]     AS 47.10.088(a)(1).

-27-                                                    7029

problems before OCS took custody of them, and OCS does not point to any. We conclude that OCS did not meet its burden of proving by clear and convincing evidence that the children had suffered a mental injury as defined in the CINA statute, and that it was clear error for the trial court to find by clear and convincing evidence that the children were in need of aid under AS 47.10.011(8)(A).

## V.    CONCLUSION

For the foregoing reasons, we REVERSE the trial court's decision terminating Theresa's parental rights to Zane and Maia and REMAND for further proceedings consistent with this opinion.