*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| REED S., | ) | |
| | ) | Supreme Court Nos. S-18123/18133 |
| Appellant, | ) | (Consolidated) |
| | ) | |
| v. | ) | Superior Court No. 4FA-21-00015 CN |
| | ) | |
| STATE OF ALASKA, | ) | O P I N I O N |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | No. 7637 – December 30, 2022 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |
| | ) | |
| MAKENNA S., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF ALASKA, | ) | |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeals from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Patricia L. Haines, Judge.

Appearances: Michael L. Horowitz, Kingsley, Michigan, for Appellant Reed S. George W. P. Madeira, Assistant Public

Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant Makenna S. Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Treg R. Taylor, Attorney General, Juneau, for Appellee. Nikole V. Schick, Assistant Public Advocate, Fairbanks, and James Stinson, Public Advocate, Anchorage, for Guardian ad Litem.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

MAASSEN, Justice.

## I. INTRODUCTION

A child was severely injured while in his father's care. The father did not immediately seek medical help and gave conflicting explanations of how his son's injury occurred. The superior court found probable cause to believe that the child was in need of aid, limited the father's contact with the child and mother, and awarded the mother custody. A few months later the father was arrested outside the family home, and evidence suggested that the mother had allowed contact between him and their son in violation of military and civil no-contact orders. The superior court adjudicated the boy as a child in need of aid based on the actions of both parents. The parents separately appealed the adjudication. But after the appeals were filed, the Office of Children's Services (OCS) informed the superior court that the child could safely be returned to his parents' care, and the superior court closed the case.

On appeal the parents argue that their appeals were mooted by the superior court's dismissal of OCS's case and that we should decline to hear the appeals and vacate the adjudication order to avoid the potential for collateral consequences. In the alternative, they argue that if this case is heard on the merits we should find that the superior court erred in adjudicating their son as a child in need of aid. We conclude that

we should hear the appeals on the merits, and we therefore do not vacate the adjudication order. On the merits, we affirm the order.

## II. FACTS AND PROCEEDINGS

### A. Kendall's Injury

Kendall was born in July 2019 to Makenna and Reed S.[1] Reed was serving in the U.S. Army at all times relevant to this case. Makenna is an Emergency Medical Technician (EMT). Their son has autism and is largely nonverbal.

One evening in January 2021 Reed was home taking care of 18-month-old Kendall while Makenna was attending class. Reed texted Makenna and told her Kendall had been hurt. Makenna asked a friend to check on them. When the friend arrived and saw Kendall, she told Reed they needed to call an ambulance immediately because the child's leg "definitely was broken or dislocated or something." Kendall was taken to the hospital, where he was diagnosed with a spiral fracture of his femur, underwent surgery, and was placed in a cast from his chest down.

Reed gave different explanations of how the injury happened. A police officer testified that Reed told him Kendall was "playing with some lotion" in the bedroom closet, and when Reed tried to take the lotion away, Kendall "ran from him and slipped on the . . . linoleum floor." Reed told the officer he called 911 about 20 minutes later. An Army criminal investigator testified that Reed later told him Kendall "was playing on . . . the bed, got excited, . . . fell off the bed and hit his knee on the floor." Later in the same interview Reed said that he "managed to grab" Kendall as he fell off the bed, "picked him up as he grabbed him, and [Kendall] like twisted in his hand and then . . . fell out of his hand and hit the floor."

---

[1] Pseudonyms are used for all family members.

The police reported the incident to OCS because Reed's explanations seemed inconsistent. Several weeks later Reed acknowledged to an OCS worker that he had initially lied about how the injury happened, but he stood by the third version. According to the OCS worker, Reed said he had not realized Kendall's leg was broken at first and thought he was just throwing a tantrum. He texted Makenna when he noticed that Kendall's leg was "super swollen." He had lied, he said, because he was worried about OCS involvement.

## B.     Military Protective Order And OCS Involvement

The day after the incident a military protective order was issued precluding Reed from having contact with Kendall and going within 300 feet of the family home.[2] Reed moved into barracks. OCS took emergency custody of Kendall, placed him with a foster parent, and filed an emergency petition for adjudication of Kendall as a child in need of aid (CINA). OCS coordinated separate visitation for Reed and Makenna.

The superior court held a probable cause hearing and, based on the parents' stipulations without admission, found probable cause that Kendall was a child in need of aid. The court also found that it was "contrary to [Kendall]'s interest to be in the home with" Reed but allowed Makenna to resume custody on condition that she "abide by all existing military or civil domestic violence restraining orders" and not allow Reed to "have any contact with the child except as authorized and approved by OCS."

Kendall was returned to Makenna's care. Reed had OCS-supervised visits which reportedly went well until partings proved too stressful for Kendall; visitation then continued by phone and video. By the time of the adjudication trial — about five months after Kendall's injury — Reed had made significant progress on his OCS case plan,

---

[2]     A successive order, issued May 17 due to a change in Reed's command, remained in effect at the time of the adjudication trial.

including attending classes and therapy; he had also worked with the military's Family Advocacy Program (FAP). Makenna mostly declined to participate in OCS services, but she did allow OCS to tour her home for purposes of creating an in-home safety plan, and she talked with an FAP provider.

In April Makenna filed a motion to dismiss OCS's petition for adjudication. She argued that she had shown she was capable of protecting Kendall and was "a non-offending, safe parent." The guardian ad litem did not oppose the motion; OCS did.

### C.     Unauthorized Contact Between Reed And Kendall

On May 12 a friend of Makenna's picked up Reed from the barracks and drove him to the family home, later testifying that she was acting at Makenna's request. After dropping Reed off, the friend told Reed's commander's wife what she had done. Police officers were dispatched, and they arrested Reed in his driveway for violating the military protective order. OCS filed a non-emergency petition for a CINA adjudication and temporary custody, alleging that Makenna had allowed contact between Reed and Kendall contrary to both the military protective order and the no-contact provision of the court's temporary custody order. Around the same time, the Army brought felony court martial charges against Reed for child abuse and violation of the military protective order.

### D.     Adjudication Trial

The superior court held an adjudication trial in early June 2021. Several witnesses testified about Kendall's injury. A responding police officer said that when he arrived on the scene Kendall "was obviously in pain and injured." A pediatric nurse who helped treat Kendall said that if OCS had not already been notified she would have reported the incident herself because of "reports of inconsistent stories about the mechanism of injury." A doctor who saw Kendall for a follow-up appointment explained that a spiral fracture like Kendall's would be painful and likely result in

"inconsolabl[e] crying" and other "signs of pain." She also said that "significant force" would be required to break a femur, and that the type of fracture "indicates that the bone was being twisted as it broke." Although she agreed that it is "not impossible for a kid to get a femur fracture from normal roughhousing play," she did not think it likely that a fall from a bed of the reported height could cause such an injury. She testified that when different stories are told about an incident, "that in and of itself is concerning . . . and would require reporting," as would a situation in which a "consistent story [is told] that doesn't fit the mechanism" of injury.

Reed and Makenna both testified. Reed invoked "his Fifth Amendment privilege against self-incrimination as to any question regarding the [military protective order] or going to the house and also as to any alleged injury to [Kendall]."[3] Makenna testified that although she recognized that Reed had initially lied about how Kendall was injured, she believed his final version of the event and did not think he had intentionally hurt the child. She testified that doctors never raised any other concerns about her or Reed's parenting.

Other testimony, including that of arresting officers, described what occurred at the family home on May 12. An officer testified that two of the officers went to the front door while a third watched the back of the house. Makenna answered the door and told them Reed was not there. The officers decided to get a search warrant. One officer was waiting outside in an unmarked patrol car when the friend who had dropped Reed off returned, walked into the covered entryway, and reemerged with Reed. The officer took Reed into custody for violating the military protective order.

---

[3]     OCS asked at trial that the superior court draw an adverse inference from Reed's claim of privilege under Alaska Rule of Evidence 512(e). The court declined to apply the inference in its decision "because a preponderance of the evidence establishes that [Kendall] is a child in need of aid even without applying the inference."

The friend who drove Reed to the house testified that Makenna had asked her to do so. She said Makenna and Reed told her that while Makenna was at the door talking to the police, Reed was in the basement with Kendall. She said she spoke with Reed and Makenna inside the house before Reed was arrested and that Reed then left with her through the front door. She also testified that Makenna had told her Reed "ha[d] been coming over [to the house] for several weeks usually at the end of the day or during the weekend." She said that Makenna "kind of hinted" she had previously left Reed alone with Kendall, but the friend was not sure that had actually happened. She testified she did not consider Reed to be a danger to Kendall, and she only made a report because as a nurse she was a mandatory reporter.

Makenna told a different story about the May 12 incident. She said she was "surprised" when Reed arrived and that it was he who had asked her friend for a ride. She testified that when Reed knocked on the door Kendall was in his highchair. She said that Reed stepped into the arctic entryway but she did not invite him in; instead she told him to leave, and he did not come in any farther. She testified that they spoke for 10 to 15 minutes before he left and that Kendall never saw him. She denied telling her friend that Kendall and Reed had hidden together in the basement or that Reed had visited on other occasions.

Makenna testified about the police then coming to the door, asking for her identification, and inquiring about Reed. She said she denied he was there, went to get her ID, and grabbed Kendall from his highchair; she testified that the child was "a really good climber" and she worried about him falling out of the highchair if left unattended. She returned to the door with Kendall. The police asked to come inside and she told them to get a warrant. After they left, the friend returned and told Makenna she was taking Reed back to the barracks, and Makenna and Kendall then went about the rest of

their evening activities. As she was getting Kendall ready for a bath, the friend knocked on the door again and told her Reed had been arrested.

The OCS caseworker assigned to the family also testified. She said she continued to "have safety concerns with both [Makenna] and [Reed] due to a history of being dishonest." She said Makenna did "not believe that [Reed] is dangerous" but that OCS "still ha[d] concerns regarding his mental health and his safety being around the child." She did not think "that [Makenna] would accurately report if something unsafe did happen with anyone involving their interactions with the child." The caseworker also stated that she had only met Kendall in person twice because Makenna had limited OCS's contact with him. And she testified that Makenna had sent her aggressive texts and phone calls and was angry that OCS had not been able to get the military protective order lifted. She testified that OCS's current goal was to maintain legal custody and some supervision of Kendall, but that the agency was comfortable leaving Kendall in Makenna's home as long as there was a safety plan in place.

Another family acquaintance testified that in April she had often spent Friday nights and Saturdays at Makenna's house, babysitting Kendall while Makenna attended classes. She said she never saw Reed during that time and had never been asked to bring him over for a visit. Reed's roommate in the barracks testified that he had never met Makenna or Kendall, that no one ever asked him to drive Reed to the family's house, and that Reed spent most of his time at the barracks and left only infrequently.

### E. The Superior Court's Findings

The superior court found by a preponderance of the evidence that Kendall was a child in need of aid under AS 47.10.011(6) (substantial physical harm or substantial risk of substantial physical harm) and (9) (neglect) due to the actions of both Makenna and Reed. With respect to Reed, the court cited "the very serious injury [Kendall] suffered while in [Reed]'s care, [Reed]'s dishonesty about how [Kendall]

suffered that injury, and [Reed]'s failure to obey orders limiting his contact with [Kendall]." As for Makenna, the court emphasized "her failure to protect [Kendall] from the ongoing risk of injury from [Reed] by allowing in-person contact with [Reed] in violation of a court order and a military protective order, despite her knowledge of the injury [Kendall] suffered in [Reed]'s care." The court acknowledged that Makenna did not consider Reed a threat to Kendall, but it reasoned that her disagreement with the orders was irrelevant. The court left Kendall in Makenna's custody "subject to [OCS's] supervision of [his] care and treatment."

Both parents appealed the CINA adjudication.

### F.   Post-Adjudication Proceedings

The superior court issued a disposition order in August 2021, stating that Kendall continued to be a child in need of aid. But in September OCS filed a motion asking the court to "releas[e] custody of [Kendall], releas[e OCS] from all liability for this child, and clos[e] this case." In an attached affidavit, the OCS caseworker attested that "there [were] no active safety concerns and OCS no longer need[ed] to be involved with this family." OCS specifically cited "the protective factors in place and [Reed's] progress" in fulfilling his case plan as the reasons for its motion. The court granted the motion and closed the case.

Makenna and Reed each filed a motion in this court asking that we vacate the CINA adjudication order and dismiss their appeals as moot. We denied those motions and subsequent motions for reconsideration.

## III.   DISCUSSION

### A.   We Decide These Moot Appeals On Their Merits And Decline to Vacate The Adjudication Order.

Makenna and Reed argue that their appeals are moot because of the superior court's dismissal of OCS's case and that we should therefore decline to reach the merits

and vacate the adjudication order finding Kendall to be a child in need of aid. As "a matter of judicial policy, mootness presents a question of law" to which we "apply our independent judgment."[4]

> **1.** **Although the appeals are moot, we decide them on their merits because of the adjudication order's potential collateral consequences.**

"A claim is moot if it has lost its character as a present, live controversy."[5] "If the party bringing the action would not be entitled to any relief even if it prevails, there is no 'case or controversy' for us to decide."[6] Quoting *Peter A. v. State, Department of Health & Social Services, Office of Children's Services*, OCS agrees that the parents' appeals are "moot in that '[o]nce the superior court dismissed the case, the [S]tate lost the power granted it by the adjudication order to interfere with [the] family'[7] on the child protection matter." But the adjudication order — finding that Kendall was, at the time, a child in need of aid due to his parents' conduct or due to conditions they created — stands unless and until it is vacated or reversed. The first question we must address is whether, despite the appeals' mootness, the adjudication order has consequences that justify its appellate review. The collateral consequences exception to the mootness doctrine "allows courts to decide otherwise-moot cases when 'a judgment may carry indirect consequences in addition to its direct force, either as a matter of legal

---

[4] *Peter A. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 146 P.3d 991, 993-94 (Alaska 2006).

[5] *Id.* at 994 (quoting *Kleven v. Yukon–Koyukuk Sch. Dist.*, 853 P.2d 518, 523 (Alaska 1993)).

[6] *Id.* (quoting *Ulmer v. Alaska Rest. & Beverage Ass'n*, 33 P.3d 773, 776 (Alaska 2001)).

[7] *Id.*

rules or as a matter of practical effect.' "[8]  The collateral consequences exception thus allows us to hear an otherwise moot case on the merits.[9]

Certain CINA adjudications may result in statutorily imposed consequences for parents who are deemed responsible for their child's CINA status.  Statutes direct the executive branch to "establish by regulation civil history standards for denial of issuance or renewal of [certain types of] license or certification" when the applicant is a "parent . . . of a child who is or was the subject of a child-in-need-of-aid petition under AS 47.10 and the individual had custody of the child at the time" of the petition, or when the parent was involved in a court proceeding which resulted in "a substantiated finding of child abuse or neglect" under AS 47.10 related to the parent's care.[10]  Administrative regulations impose a 10-year barrier to licensing for certain jobs that require background checks "based upon a civil finding relating to abuse, neglect, or exploitation of a child . . . under AS 47.10 . . . for any case that did not result in the termination of parental rights."[11]  Makenna argues based on these laws that the adjudication order "precludes her from earning a livelihood in her profession [as an EMT] for the next decade."  We do not need to decide whether Makenna's interpretation of these laws will ultimately prove to be correct; we do agree that the restrictions appear potentially burdensome enough to

---

[8]     *Id.* at 994-95 (quoting 13A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 3533.3, at 291 (2d ed.1984)).

[9]     *In re Hospitalization of Joan K.*, 273 P.3d 594, 597-98 (Alaska 2012).

[10]     AS 47.05.325(a)(1); AS 47.05.330(a)(3).

[11]     7 Alaska Administrative Code (AAC) 10.905(f)(3) (2020); AS 47.05.300; *see also* 7 AAC 10.990(a)(11) (defining such a "civil finding" to include an "adjudication . . . that a provider or applicant committed . . . abuse, neglect, or exploitation under AS 47.10").

"justif[y] an exception to mootness under the collateral consequences doctrine." We therefore will review this otherwise moot case on the merits.

**2. Equity does not require vacatur of an order that is reviewable on its merits.**

As Makenna also points out, however, the existence of collateral consequences does not *require* that we reach the merits of a moot case. We may instead avoid the collateral consequences by vacating the underlying order — if we first determine that vacatur is required by principles of equity.[12] Makenna and Reed argue that we should resolve this case in just that way: decline to hear it on mootness grounds and mitigate the collateral consequences by vacating the adjudication order.

In the 1980s we approved the federal practice of "revers[ing] or vacat[ing] the judgment below and remand[ing] the case, with directions to dismiss the complaint," when a judgment was mooted while on appeal.[13] As the United States Supreme Court explained in *United States v. Munsingwear, Inc.*, this practice "prevent[s] a judgment, unreviewable because of mootness, from spawning any legal consequences."[14] It "clears

---

[12]     *See Peter A.*, 146 P.3d at 995-97 (when appeal was mooted by OCS dismissal of CINA case, declining to review case on merits, vacating order for equitable reasons, and thus avoiding possible collateral consequences).

[13]     *City of Valdez v. Gavora, Inc.*, 692 P.2d 959, 960 (Alaska 1984) (citing *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950)).

[14]     *Munsingwear, Inc.*, 340 U.S. at 41. We note that in Alaska mootness is never an absolute bar to appellate review, as the doctrine "is a matter of judicial policy, not constitutional law." *RLR v. State*, 487 P.2d 27, 45 (Alaska 1971). Mootness in Alaska "does not act as a limit on jurisdiction," "unlike its federal counterpart." *Regul. Comm'n of Alaska v. Matanuska Elec. Ass'n*, 436 P.3d 1015, 1027 (Alaska 2019). When analyzing claims of mootness, we "should first look to [our] own precedent and statutes." *Bowers Off. Prods., Inc. v. Univ. of Alaska*, 755 P.2d 1095, 1096 (Alaska 1988); *cf. Falcon v. Alaska Pub. Offs. Comm'n*, 570 P.2d 469, 475 (Alaska 1977) ("Since the
(continued...)

the path for future relitigation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance."[15] The Supreme Court later clarified in *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership* that because vacatur is an equitable remedy, courts should determine whether it is appropriate on a case-by-case basis.[16] In making this determination, federal courts look principally to "whether the party seeking relief from the judgment below caused the mootness by voluntary action," though they "must also take account of the public interest."[17]

Although vacatur typically arises as a remedy when the case is unreviewable because of mootness,[18] Makenna and Reed argue that these principles, as we applied them in *Peter A.*, require vacatur here. In *Peter A.* a couple's children were removed from their mother's care while their father, Peter, was hospitalized and temporarily incapacitated.[19] Once he was healthy and able to parent, OCS placed the

---

[14]     (...continued)
requirement of adversity is neither federally mandated nor required by the Alaska Constitution, the court's requirement of adversity as a component of standing is essentially a judicial rule of self-restraint."). But federal precedent is nonetheless helpful. *State v. ACLU of Alaska*, 204 P.3d 364, 368 n.11 (Alaska 2009).

[15]     *Munsingwear, Inc.*, 340 U.S. at 40.

[16]     513 U.S. 18, 24-25 (1994) ("From the beginning we have disposed of moot cases in the manner ' "most consonant to justice" . . . in view of the nature and character of the conditions which have caused the case to become moot.' " (quoting *United States v. Hamburg-Amerikanische Packetfahrt-Actien Gesellschaft*, 239 U.S. 466, 477-78 (1916) (cleaned up))); *see also Peter A.*, 146 P.3d at 995 (explaining that *U.S. Bancorp* "clarified that not all moot claims require vacatur").

[17]     *U.S. Bancorp Mortg. Co.*, 513 U.S. at 24, 26.

[18]     *See*, *e.g.*, *Gavora, Inc.*, 692 P.2d at 960-61.

[19]     *Peter A.*, 146 P.3d at 992-93.

children with him on a trial basis.[20] The superior court then adjudicated the children in need of aid based solely on the mother's conduct, giving Peter continued custody subject to OCS supervision.[21] About five weeks later OCS, concluding that the children were no longer at risk, moved to dismiss and the superior court granted the motion.[22] Peter appealed the adjudication order.[23]

We decided that Peter's appeal was moot because he could not "show . . . that concrete relief would be available to him if this court reversed the adjudication order."[24] We further noted, however, that we could reach the merits of the appeal if an exception to the mootness doctrine — such as the collateral consequences exception — applied.[25] Peter pointed to AS 47.10.011(10), which provided that a child adjudicated in need of aid due to a parent's substance abuse is later presumed to be in need of aid if the parent resumes the substance abuse within a year, and to AS 47.10.011(9), which provided that a child can be adjudicated in need of aid based on past neglect of another child in the same household.[26] We "assume[d] for the sake of discussion that [these two statutes] potentially create[d] collateral consequences," but we concluded that we could still determine the appeal to be moot because equity required vacatur of the adjudication order, and therefore Peter would suffer no collateral

---

[20]    *Id.* at 993.

[21]    *Id.*

[22]    *Id.*

[23]    *Id.*

[24]    *Id.* at 994.

[25]    *Id.* at 994-95.

[26]    *Id.* at 994.

consequences.[27]  We noted our earlier adoption of the seemingly broad federal rule that a holding of mootness invariably required vacating the judgment below.[28]  We observed: "[W]hen a prevailing party voluntarily moots a case, without the appellant's acquiescence, the appellant, through no fault of his own, is prevented from obtaining appellate review of his claim," and "principles of equity require vacatur of the challenged order in such a case."[29]  We were able to resolve *Peter A.* through vacatur instead of hearing the case on the merits because nothing in the record indicated any dispute as to Peter's fitness as a parent.[30]  The adjudication order finding his children in need of aid and the subsequent dismissal of the case were both wholly unrelated to Peter's conduct and yet left Peter without an avenue for appellate review.[31]  His "entitlement . . . [to] vacatur" was evident.[32]

We also recognized in *Peter A.*, however, "that not all moot claims require vacatur," though we found it unnecessary to decide whether *Munsingwear*'s broad rule

---

[27]     *Id.* at 995-96.

[28]     *Id.* at 995  (citing *City of Valdez v. Gavora, Inc.*, 692 P.2d 959, 960 (Alaska 1984); *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950)).

[29]     *Id.*

[30]     *See id.* at 993, 997 (describing the adjudication order finding Peter's children in need of aid as based entirely on Peter's wife's conduct, and later noting that "[c]ases in which the state releases custody of the children and thereby moots a fit parent's appeal are presumably only a subset of those cases in which" the issue of "whether children can be adjudicated in need of aid over the objections of one available fit and willing parent" "could arise, and in that subset of cases, relief is available in the form of vacatur").

[31]     *See id.* at 994-95.

[32]     *See U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994).

favoring vacatur "should be narrowed in light of the Supreme Court's discussion in *U.S. Bancorp*."[33]  We now conclude that *U.S. Bancorp* lays out appropriate guideposts for deciding whether vacatur is appropriate in a given case.

The issue in *U.S. Bancorp* was "whether appellate courts in the federal system should vacate civil judgments of subordinate courts in cases that are settled after appeal is filed or certiorari sought."[34]  The Supreme Court noted the parties' agreement in that case "that vacatur must be decreed for those judgments whose review is, in the words of *Munsingwear*, ' "prevented through happenstance" ' — that is to say, where a controversy presented for review has 'become moot due to circumstances unattributable to any of the parties.' "[35]  The Court explained *Munsingwear*'s "reference to 'happenstance' . . . as an allusion to this equitable tradition of vacatur," providing that "[a] party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance, ought not in fairness be forced to acquiesce in the judgment."[36]

The Supreme Court's discussion of "happenstance" as integral to the "equitable tradition of vacatur"[37] is particularly relevant here.  Unlike the father in *Peter*

---

[33]     *Peter A.,* 146 P.3d at 995 & n.25.

[34]     *U.S. Bancorp Mortg.*, 513 U.S. at 19.

[35]     *Id.* at 23 (quoting *Karcher v. May*, 484 U.S. 72, 82, 83 (1987)).  The parties in *U.S. Bancorp* "also agree[d] that vacatur must be granted where mootness results from the unilateral action of the party who prevailed in the lower court," *id.*, a circumstance we do not find relevant here.  Although it was OCS that moved to dismiss the CINA case, we agree with its observation that it was "because of the parents' actions and the parents' progress [that] OCS [took] the step to request that the child protection case be closed."

[36]     *Id.* at 25.

[37]     *Id.*

*A.* who was urging us to consider his appeal on the merits,[38] Reed and Makenna are not "seek[ing] review of the merits of an adverse ruling" and being "frustrated by the vagaries of circumstance."[39] They rather seek to *avoid* review on the merits, and review is not "frustrated" at all because we are willing to consider their appeal under the collateral consequences exception to the mootness doctrine. Reed and Makenna's circumstances thus place them on the preferred pathway for litigants who seek to challenge a trial court's ruling: appellate review on the merits.[40]

The Supreme Court in *U.S. Bancorp* further observed that "[a]s always when federal courts contemplate equitable relief, our holding must also take account of the public interest."[41] The statutes Makenna cites as demonstrating the adverse consequences of the CINA adjudication order are directly connected to the public interest; they seek to promote public safety by ensuring that persons with certain histories of abuse or neglect are not given responsibility over particularly vulnerable people.[42]

---

[38]    *Peter A. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 146 P.3d 991, 992, 994 (Alaska 2006).

[39]    *U.S. Bancorp Mortg. Co.*, 513 U.S. at 25.

[40]    *See id.* at 27 (noting that in ordinary course lower court judgments can be disturbed only through appellate avenues established by Congress and explaining that allowing party "to employ the secondary remedy of vacatur as a refined form of collateral attack would . . . disturb the orderly operation of the . . . judicial system").

[41]    *Id.* at 26.

[42]    AS 47.05.300-.330. In *Peter A.* we assumed there would be collateral consequences "for the sake of discussion," but they appeared to be largely theoretical. 146 P.3d at 995. Makenna makes a plausible argument that the adjudication order could impact her continued employment as an EMT. In *Peter A.* we "express[ed] no opinion about Peter's interpretation of" the two statutes he cited "or whether they may give rise to post-dismissal consequences adverse to him"; we do the same here. *Id.* at 995 n.20.

The evident statutory purposes weigh against vacatur in lieu of review on the merits. And public interest generally favors appellate review when possible. According to the Supreme Court in *U.S. Bancorp*, "*Munsingwear* establishes that the public interest is best served by granting relief when the demands of 'orderly procedure' . . . cannot be honored; we think conversely that the public interest requires those demands to be honored when they can."[43]

Finally, we emphasize the Supreme Court's admonition in *U.S. Bancorp* that it is the burden of "the party seeking relief from the status quo of the [judgment below]" to demonstrate its "equitable entitlement to the extraordinary remedy of vacatur."[44] Reed and Makenna have not shown their entitlement to an extraordinary remedy. We again contrast this case to *Peter A.*, where, as OCS aptly explains, "a non-offending parent defend[ed] against an adjudication based on the sole conduct of the offending parent." We vacated the adjudication order as a matter of equity. Unlike the father in *Peter A.*, neither Reed nor Makenna was blameless, as we discuss further below. In seeking vacatur of the adjudication order, they seek to escape not the consequences of another's actions unfairly attributed to them but rather the consequences the legislature has prescribed for their own actions. Equity does not favor vacatur under such circumstances.

To summarize: Equity allows the court to vacate an order that is unreviewable because of mootness. But when we are willing to review the challenged

---

[43]    *U.S. Bancorp Mortg. Co.*, 513 U.S. at 27 (quoting *United States v. Munsingwear, Inc.*, 340 U.S. 36, 41 (1950)).

[44]    *Id.* at 26. *Peter A.* emphasized the equitable nature of the remedy. 146 P.3d at 992 ("[B]ecause we vacate the adjudication order as a matter of equity, Peter will suffer no collateral consequences from the adjudication."); *id.* at 995 ("We agree with the United States Supreme Court that principles of equity require vacatur of the challenged order in such a case.").

order despite its mootness — as we are here — there is no need to consider "the secondary remedy of vacatur"[45] as a substitute for an appellate decision on the merits.

**B.     The Superior Court's Finding That Kendall Was A Child In Need Of Aid Under AS 47.10.011(6) Based On Both Reed's And Makenna's Conduct Was Not Clearly Erroneous.**

The superior court adjudicated Kendall as a child in need of aid based on both Makenna's and Reed's conduct under AS 47.10.011(6) (physical harm) and (9) (neglect).    At an adjudication hearing OCS "has the burden of proving by a preponderance of the evidence that the child is a child in need of aid."[46]   In other words, the court must conclude that "it [i]s more likely than not" that the child is in need of aid.[47]

Whether a child is in need of aid is a factual determination we review for clear error.[48]   "A finding is clearly erroneous if we are left with a definite and firm conviction that the trial court made a mistake,"[49] based on "a review of the entire record in the light most favorable to the party prevailing below."[50]   "Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[51]   "Whether a

---

[45]     *See U.S. Bancorp Mortg. Co.*, 513 U.S. at 27.

[46]     Alaska CINA Rule 15(c); *see also* AS 47.10.011.

[47]     *In re T.P.*, 838 P.2d 1236, 1242 (Alaska 1992).

[48]     *Theresa L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 353 P.3d 831, 837 (Alaska 2015).

[49]     *Id.*

[50]     *Audrey H. v. State, Off. of Child.'s Servs.*, 188 P.3d 668, 672 (Alaska 2008).

[51]     *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1267 (Alaska 2008) (citation omitted).

trial court's findings satisfy the relevant statutory requirements is a question of law that we review de novo."[52]

> ### 1. The superior court's finding that Kendall was a child in need of aid under AS 47.10.011(6) based on Reed's conduct was not clearly erroneous.

Under AS 47.10.011(6), a court may conclude that a child is in need of aid if it finds that "the child has suffered substantial physical harm, or there is a substantial risk that the child will suffer substantial physical harm, as a result of conduct by or conditions created by the child's parent . . . or by the failure of the parent . . . to supervise the child adequately." In determining that "it is more likely true than not that [Kendall] is a child in need of aid under AS 47.10.011(6)," the superior court found that Reed "ignored [Kendall] who was likely crying inconsolably and clutching his leg in pain for at least an hour" before he called 911 at the urging of Makenna's friend. The court also noted the testimony of a treating pediatric specialist, who testified that the femur is not easily broken, that a break like Kendall's would require a significant amount of force, and that the injury would likely cause substantial pain and inconsolable crying. The court noted Reed's conflicting stories and the fact that Reed now admitted that two of them were false. The court further observed, "There is nothing to recommend [Reed]'s third version of events as the truth, other than the fact that he has persisted in claiming it longer than his prior two admitted lies." The court noted Reed's strong incentive to lie about the incident, his history of lying about it, his story's lack of detail, and his failure to seek immediate medical attention for Kendall. On the whole, the court found that it was more likely than not that Kendall's femur fracture was caused by Reed's conduct or by conditions he created.

---

[52] *Audrey H.*, 188 P.3d at 672-73.

Reed argues that there was insufficient evidence to support this finding or a finding that Kendall was at a substantial risk of suffering harm in the future because of his conduct. He argues "that there was no history of abuse allegations . . . and no evidence of any prior injuries of any other sort." He contends that "OCS presented sufficient evidence to show that *maybe* [Reed] was somehow responsible for [Kendall]'s injury, but certain[l]y not that it was more likely than not." (Emphasis in original.)

But our review of the record does not leave us with "a definite and firm conviction that the trial court made a mistake"[53] when it found it more likely than not that Kendall's injury was a result of Reed's actions or omissions. This finding was not clearly erroneous. And applying our independent judgment, we conclude that the superior court's factual findings are legally sufficient to support a finding of CINA status under AS 47.10.011(6), substantial risk of harm, based on Reed's conduct.

2. **The superior court's finding that Kendall was a child in need of aid under AS 47.10.011(6) based on Makenna's conduct was not clearly erroneous.**

The superior court's risk of harm finding with regard to Makenna did not rest on Kendall's injury,[54] but rather on her conduct in allowing contact between Reed and Kendall in violation of the military and superior court no-contact orders. The court did "not find [Makenna]'s testimony reliable with regard to preventing [this] unauthorized contact." Focused on the events of May 12, the court noted that "[u]nder [Makenna]'s timeline [of that day], there is an unexplained gap of significant length — twenty to thirty minutes before the police arrived, and then some additional time after she requested they get a warrant but before [the friend] returned — in which [Reed]'s

---

[53]     *See Theresa L.*, 353 P.3d at 837.

[54]     The court found that "[Makenna] was not present in the home when [Kendall] was injured" and that she "had no role in the injury."

whereabouts are unexplained." The court also noted an inconsistency between Makenna's testimony that she left Kendall alone while she talked to Reed for 10 to 15 minutes in the arctic entryway and her testimony that when she talked to the police officers she brought Kendall to the door because she did not want to leave him unattended. The court found that Makenna's "concern for leaving [Kendall] unsupervised in the high chair [was] more credible than her claim that she left him alone for a quarter of an hour while she chatted with [Reed] out of sight of [Kendall]." The court concluded that it was likely Reed was in the house at the time and therefore in violation of the military and civil no-contact orders.

We read the court's findings regarding Makenna's conduct as taking into account more than just the May 12 incident. The court also cited her friend's testimony that Makenna "had confessed to her that [Reed] had been coming over to the house for several weeks, often in the evenings and on weekends, to see [Makenna] and [Kendall]." The court did not explicitly accept this allegation as true, but its findings about Makenna's credibility and her general resistance to the civil and military no-contact orders indicate that the court considered the May 12 incident to be only the most visible violation in a troublesome course of conduct. The court wrote that it did "not find [Makenna's] testimony reliable with regard to preventing unauthorized contact between [Reed] and [Kendall]." It noted Makenna's "significant frustration with the military protective order, and with the manner in which [Reed's] chain of command reacted to the incident involving [Kendall's] broken femur." It wrote that while Makenna was "sincere in her *desire* to protect [Kendall], her actions during the pendency of this case call into question her *ability* to do so" (emphasis in original), and it cited Makenna's "failure to protect [Kendall] from subsequent contact with his father" as grounds for its CINA adjudication.

Makenna acknowledges the superior court's finding that she "had not prevented contact between Kendall and his father," but she argues that "[t]he mere fact that the contact was unauthorized did not render it a substantial risk of physical harm." Further, she contends, "[t]he extensive OCS-approved contact between Reed and Kendall belies OCS's claim about its inherently dangerous nature." Makenna contrasts this case with *Burke P. v. State, Department of Health & Social Services, Office of Children's Services*,[55] in which we found that a father had exposed his children to a substantial risk of physical harm by not preventing abuse by their mother, arguing that the behavior in that case was far more extreme than it is here.[56] She also argues that the May 12 contact took place under substantially different circumstances than did the January incident: Reed was not solely responsible for Kendall, the visit was brief, and Makenna was there the whole time.

OCS points to the findings about Kendall's initial injury, the contact restrictions imposed by the military and civil no-contact orders, and Makenna's flouting of those orders. OCS argues that violation of the orders was "[o]n its face . . . enough to establish a substantial risk of harm." It argues that "giving Reed access to Kendall was a per se threat to his physical [safety]."

We do not need to decide whether Makenna's disregard of the orders' no-contact restrictions was sufficient by itself to support a CINA finding under AS 47.10.011(6). The evidence allowed the court to find that Makenna did not sufficiently appreciate the risk to Kendall's safety that the no-contact orders were intended to address. In addition to the testimony about the May 12 incident, we note the testimony — including from Makenna herself — that she did not believe Reed presented

---

[55] 162 P.3d 1239 (Alaska 2007).

[56] *Id.* at 1244.

a threat to Kendall. The OCS caseworker testified that Makenna's attitude made the worker "very hesitant to believe that [she] would accurately report if something unsafe did happen with anyone involving their interactions with the child." Given the evidence, and the preponderance standard of proof that governs the CINA finding at the adjudication stage,[57] we cannot say that the superior court clearly erred by finding that Kendall was at a substantial risk of substantial physical harm due to Makenna's conduct.[58] Its findings satisfy the statutory standard. We therefore affirm the court's finding that Kendall was a child in need of aid due to Makenna's conduct under AS 47.10.011(6).

A CINA adjudication needs only one ground to support it.[59] Because we affirm the superior court's findings that Kendall was a child in need of aid under AS 47.10.011(6), we do not reach its findings of neglect under subsection (9).

## V. CONCLUSION

We AFFIRM the superior court's order adjudicating Kendall as a child in need of aid.

---

[57]   AS 47.10.011.

[58]   AS 47.10.011(6).

[59]   *See, e.g.*, *Annette H. v. State, Dep't of Health & Soc. Servs., Off. of Chid.'s Servs.*, 450 P.3d 259, 265-66 (Alaska 2019).