*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| BRAD S., | ) |
| | ) Supreme Court No. S-18719 |
| Appellant, | ) |
| | ) Superior Court Nos. |
| v. | ) 3KN-21-00034/00035/00036/00037 CN |
| | ) (Consolidated) |
| STATE OF ALASKA, DEPARTMENT | ) |
| OF FAMILY & COMMUNITY | ) O P I N I O N |
| SERVICES, OFFICE OF | ) |
| CHILDREN'S SERVICES, | ) No. 7743 – February 7, 2025 |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Lance Joanis, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Treg Taylor, Attorney General, Juneau, for Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

BORGHESAN, Justice.
CARNEY, Justice, concurring.

## I. INTRODUCTION

A father of four appeals the ruling that his children were in need of aid. The children were removed from the home after allegations that the father had sexually

abused his 12-year-old daughter. The primary issue before the superior court was whether the father's conduct, which included washing his daughter's breasts during lengthy showers together, could be reasonably characterized as normal caretaking, interaction, or affection. On appeal the father contends that the superior court relied on facts not in evidence, violated his Fifth Amendment rights by drawing an adverse inference from his refusal to testify, and erred in concluding that the conduct amounted to sexual abuse.

We see no errors that warrant reversal and therefore affirm the superior court's adjudication order.

## II.  FACTS AND PROCEEDINGS

### A.  Facts

Brad S. and his wife Rebecca are the parents of four children:  Brad Jr., Gerald, Bettina, and Louisa.[1]

In October 2021 a friend of Bettina's alleged that Brad sexually assaulted her during a sleepover. The friend also alleged that she had seen Brad grope Bettina's breasts and that Bettina had acted as if that was normal behavior. After learning of the accusations, the Alaska State Troopers interviewed Bettina and Rebecca.

During her interview Rebecca stated that while the children slept in different rooms from the one she and Brad shared, the girls would sometimes sleep in their parents' bed "just randomly whenever," sometimes naked. She explained that the family members generally were not embarrassed if anyone saw them naked. Rebecca noted, however, that the boys were "at that age" when they had started to become a little embarrassed to see her naked. She also stated that although the boys used to sleep in their parents' bed, they had stopped doing so without being told that they were too old. Rebecca also noted that Bettina, who was 12 years old at the time of these events, had stopped walking around topless "since she started developing."

---

[1]  We use pseudonyms for all family members.

Brad was arraigned on related criminal charges shortly after the interview. Following the arraignment, the Troopers interviewed Rebecca again. Rebecca explained that she thought it was normal that Bettina showered and slept with her parents. She confirmed that she had seen Brad and Bettina sitting and talking together in the shower, sometimes for 45 minutes at a time. Rebecca stated that she had suggested to Brad several months earlier that it might be time for him to stop showering with Bettina. Rebecca maintained that she had only raised the topic because Bettina was getting older. According to Rebecca, Bettina had started menstruating the year prior. Rebecca added that she "[didn't] know if [Bettina] ever would've thought that it was weird" and that she "just didn't want to get to 16, 17 [years old]." According to Rebecca, Bettina's brothers had stopped showering with their parents when they were between 9 and 12 years old.

When asked for more detail about the showering, Rebecca explained that the showers were "just like a washdown." She then added that "no hands were on breasts longer than they should have been, in [her] opinion." Rebecca explained that her daughters sometimes needed help washing and conditioning their hair but did not indicate that Bettina could not wash her own body. The interviewing trooper asked, "[I]f you were walking by and saw [Brad] with an erection in the shower with her, like is that weird?" Rebecca responded, "Mm-mm (negative). No." The trooper then clarified, "[H]e just has an erection in the shower?" Rebecca responded, "Yeah. Sometimes it's just — like he'll be walking around the room and it will happen. He'll have an erection."

The trooper asked whether Bettina had ever made any comments to Rebecca that worried or concerned her. Rebecca responded that she had Brad's contact saved in her phone as "Sexy Hubby" and that Bettina would sometimes refer to Brad as "my sexy hubby." However, Rebecca indicated that Bettina only understood the phrase to represent her parents' relationship.

Following Rebecca's disclosure that Brad showered and slept naked with Bettina, the Office of Children's Services (OCS) met with the family to reassess the children's safety. OCS did not believe that Rebecca would be able to protect the children and discussed a safety plan with her. The children were subsequently removed by OCS.

## B. Proceedings

OCS filed a non-emergency petition to adjudicate all four children in need of aid based on Bettina's friend's initial allegations and statements made by various family members during their interviews. At the adjudication hearing in January 2022, Brad's attorney advised the court that Brad was invoking his right to remain silent under the Fifth Amendment and asserting a blanket privilege against any questions related to the subject of the criminal charges against him.[2] The court heard testimony from a number of other witnesses, including an OCS worker who testified that the family's younger daughter had confirmed seeing Brad "washing [Bettina's] boobs."

At the conclusion of the hearing, the court issued a temporary custody and adjudication order, finding all four children in need of aid on grounds of sexual abuse and neglect.[3] The court noted that "time [did] not allow detailed findings to be written or recorded and distributed as quickly as this order can be distributed." However, the court stated that reunification efforts with Rebecca had been unsuccessful "due to her lack of willingness to engage with OCS." The court found that it was "contrary to the welfare of each child" to return to Brad's home at the time.

In March 2022 OCS petitioned the court to release the children from state custody. The petition maintained that Brad "did perpetrate sexual abuse of his daughter,

---

[2] *See* U.S. Const. amend. V ("No person shall . . . be compelled in any criminal case to be a witness against himself . . . ."); Alaska Const. art. I, § 9 ("No person shall be compelled in any criminal proceeding to be a witness against himself.").

[3] AS 47.10.011(7), (9).

[Bettina], and that [Rebecca] was aware of what was occurring in the home but was unable/unwilling to stop further victimization by protecting the children." The petition stated that "it was evident that [Rebecca] did not believe that [Brad] had sexually abused his daughter or the other alleged victim." And though Brad's conditions of release prohibited him from contacting his own children, the petition further noted that Rebecca was facilitating "continued 'grooming' type behavior," such as Bettina's wearing Brad's dog tags and sleeping in his old shirts. The petition explained that it was "no longer beneficial for the children to continue with counseling" considering their increasing reluctance to engage with their case worker and clinician. This petition was not opposed.[4]

Nearly two weeks later, and before ruling on the petition for release, the court issued oral findings in support of the earlier adjudication order. The court first discussed Rebecca's interviews with the Troopers, as well as a report produced by Rebecca's expert witness at the adjudication hearing. The court then noted that Brad had invoked his right to remain silent at the adjudication hearing. While acknowledging Brad's right to not incriminate himself in his ongoing criminal case, the court explained that it was drawing a negative inference from Brad's silence: that sexual contact occurred, "meaning his rubbing his hands on, as [Rebecca] confirmed, [Bettina's] breasts while in the shower naked." The court further inferred that Brad and Bettina "regularly" slept in bed together naked.

---

**4** In response to this petition, the guardian ad litem (GAL) filed a motion seeking information from OCS prior to taking a position on the petition for release. The superior court granted this motion, commenting that the petition for release of custody was "not typical" and indeed "may [have been] nearly a formality, in that the department's lack of presentation of further evidence may [have left] the court with no factual basis to force the department to maintain custody or supervision that it [did] not seek." Following this order, the GAL filed her non-opposition to the petition.

The superior court found that Brad had sexually abused Bettina based on these inferences and a number of other factual findings. These findings included that Bettina had started her period over a year before the investigation began, that Brad got erections while he and Bettina were both sleeping naked in bed, and that Brad touched Bettina's breasts while in the shower. The court also found that the children were at substantial risk of being sexually abused because Rebecca failed to stop her husband's conduct and continued to support him. The court also determined that the children were in need of aid due to neglect.

One month later, the superior court granted the State's petition for release. Brad appeals the court's adjudication order, arguing that the superior court's findings were not based on facts in evidence, that the superior court violated his Fifth Amendment right to remain silent, and that his conduct did not constitute sexual abuse.

## III. STANDARD OF REVIEW

"Whether the superior court's factual findings satisfy applicable child in need of aid statutes and rules is a question of law that we review de novo."[5] "A superior court's findings regarding whether a child is in need of aid" are "factual questions that we review for clear error."[6] "Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the prevailing party below leaves us with a definite and firm conviction that a mistake has been made."[7]

---

[5] *S.H. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 42 P.3d 1119, 1122-23 (Alaska 2002).

[6] *Jimmy E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 529 P.3d 504, 512-13 (Alaska 2023).

[7] *Id.* at 513 (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 310 P.3d 943, 949 (Alaska 2013)).

"The scope of the constitutional right against self-incrimination is 'a question of constitutional law which we decide de novo.' "[8] "Under the de novo review standard, we exercise our independent judgment, and our 'duty is to adopt the rule of law that is most persuasive in light of precedent, reason, and policy.' "[9]

## IV.   DISCUSSION

The core of this appeal is whether the superior court made factual or legal errors in ruling that Brad engaged in unlawful sexual contact that placed the children in need of aid.[10]   Brad raises three main arguments:  first, that the superior court's adjudication was based on "heavily misconstrued" facts and facts not in evidence; second, that the superior court erred in drawing an adverse inference from Brad's refusal to testify; and third, that the evidence did not support a finding that the children were in need of aid under AS 47.10.011(7) due to sexual abuse.  We first determine that the court did not clearly err in making its factual determinations.  We then conclude that the court did not violate Brad's Fifth Amendment rights by drawing a negative inference

---

[8]   *Goldsbury v. State*, 342 P.3d 834, 836 (Alaska 2015) (quoting *State v. Gonzalez*, 853 P.2d 526, 529 (Alaska 1993)).

[9]   *Id.* (quoting *Johnson v. State*, 328 P.3d 77, 81 (Alaska 2014)).

[10]   Brad's appeal is technically moot because the superior court released custody to Rebecca and Brad and closed the case.  *See Reed S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 522 P.3d 182, 188 (Alaska 2022) ("If the party bringing the action would not be entitled to any relief even if it prevails, there is no 'case or controversy' for us to decide." (quoting *Peter A. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 146 P.3d 991, 994 (Alaska 2006))).  However, the adjudication order has consequences that justify appellate review because Brad is a peace officer.   Courts may decide otherwise-moot cases under the collateral consequences exception when "a judgment may carry indirect consequences in addition to its direct force."  *Id.* (quoting *Peter A.*, 146 P.3d at 994-95).  "Certain CINA adjudications may result in statutorily imposed consequences for parents who are deemed responsible for their child's CINA status."  *Id.*; *see* 7 Alaska Administrative Code (AAC) 10.905(f)(3).   Since CINA adjudications pose adverse collateral consequences for the future employment prospects of peace officers like Brad, we consider Brad's appeal under the collateral consequences exception.

against him. We finally hold that the evidence presented can be construed as demonstrating sexual contact, and thus that the superior court did not err in adjudicating Bettina as a child in need of aid.

**A.    The Superior Court Did Not Clearly Err In Making Its Factual Findings.**

Brad argues that the superior court's conclusion that sexual abuse occurred was based on "heavily misconstrued" facts and facts not in evidence. In reviewing the record, we are not left with a definite and firm conviction that the superior court erred in making its factual findings.

First, Brad contests the court's statement that he "sometimes may have had an erection" while showering with Bettina. But this statement is based on Rebecca's own statements during her interviews. When asked, "[I]f you were walking by and saw [Brad] with an erection in the shower with her, like is that weird?" Rebecca responded, "Mm-mm (negative). No." The interviewing trooper then clarified, "[H]e just has an erection in the shower?" Rebecca responded, "Yeah. Sometimes it's just — like he'll be walking around the room and it will happen. He'll have an erection." This exchange shows that Rebecca believed it was not uncommon or weird to see Brad exhibit sexual arousal around the house, including in the shower with Bettina. However, we note that the court did not actually make a factual finding that Brad *had* an erection while showering with Bettina, so we do not treat this statement as such.

Second, Brad argues that the court's finding that he "gets erections while [Bettina] is naked in bed with him" was incorrect and unsupported by the record. However, Rebecca confirmed that Bettina still sometimes slept naked in her parents' bed. And though Rebecca did not specifically say that Brad was sexually aroused when this happened, this is not a far leap to make from Rebecca's separate confirmation that it would not be weird to see Brad with an erection around the house or while showering with Bettina. Thus, we are not left with a definite and firm conviction that the superior court erred in making this finding.

Third, Brad contends that he never "rubbed" his hands on Bettina's breasts in the shower, which was the term the superior court used to describe his conduct. Brad is correct that this word was never used by any parties or witnesses to the case. During her interviews, Rebecca described the showers as "just like a washdown." And during trial, an OCS worker testified that the family's younger daughter had confirmed seeing Brad "washing [Bettina's] boobs."

While we recognize that the word "rubbed" sounds more lurid than the word "washed," the superior court's use of "rubbed" does not undercut the key finding that Brad had "touch[ed]" Bettina's breasts in the shower. Though Rebecca stated that "no hands were on breasts longer than they should have been, in [her] opinion," it is undisputed that Brad touched Bettina's breasts for some period of time.[11] And the superior court was not required to accept Rebecca's characterization of the touching as normal or appropriate.

The superior court's finding is also supported by other evidence presented. Brad and Bettina regularly took lengthy showers together, sometimes sitting and talking for 45 minutes in the shower. At the time of the investigation, Bettina was 12 years old. She had begun developing adult breasts and had started menstruating around one year prior. Because Bettina was getting older, Rebecca had suggested to Brad several months before the investigation that it may be time to stop showering with Bettina. Rebecca also had expressed discomfort that Bettina had referred to Brad as "my sexy hubby," a reference to how Rebecca has Brad's contact saved in her phone, though Rebecca clarified that Bettina understood the phrase only to represent her parents'

---

[11]     "[K]nowingly touching, directly or through clothing, the victim's . . . female breast" meets the statutory definition of "sexual contact." AS 11.81.900(b)(61)(A)(i).

-9-                                                                        7743

relationship.[12] Given this other evidence, the superior court did not clearly err in finding that Brad rubbed Bettina's breasts in the shower.

**B.      The Superior Court Did Not Violate Brad's Fifth Amendment Rights In Drawing An Adverse Inference Against Him.**

The superior court drew adverse inferences from Brad's refusal to testify: that sexual contact had occurred, "meaning rubbing his hands on . . . [Bettina's] breasts while in the shower naked" and that Brad and Bettina "regularly" slept in bed together naked.  Brad argues these inferences were drawn in error and raises two questions:

---

[12]      Brad also argues that the superior court violated his First Amendment rights to free religious exercise when commenting on his and Rebecca's matching pendants.  U.S. Cont. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ."); Alaska Const. art. I, § 4 ("No law shall be made respecting an establishment of religion, or prohibiting the free exercise thereof.").  The court stated that "it was notable" that Brad and Rebecca were both wearing necklaces with "very similar" pendants when they were in court because it was "unusual for people to have outside of their clothing a large chain with a pendant."  But the court did not speculate that the pendants were religious in nature. In any event, the inference the court drew from the pendants — that Rebecca was "still very much connected to her husband" — is extraneous to whether the acts described amount to sexual contact.

Brad further contends that the superior court mistakenly used the word "abhorrent" instead of "aberrant" when concluding that his conduct with Bettina showed the other children were also at risk.  The significance of the distinction in terms comes from our case law.  In another CINA case involving alleged sexual abuse under AS 47.10.011(7), we quoted a California decision for the proposition that the father's "conduct [was] 'so sexually aberrant' to support the common sense conclusion that most every person in the family home was at risk of sexual abuse."  *Rowan B., Sr. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.* (*Rowan I*), 320 P.3d 1152, 1158 (Alaska 2014) (quoting *In re Ana C.*, 139 Cal. Rptr. 3d 686, 689 (2012)).  Brad's counsel suggests that the superior court used the wrong term, "abhorrent,"  due to the court's "sloppiness" or "cravenness."  But the court made no mistake.  Although the transcript uses the word "abhorrent," it is clear from the audio recording of the adjudication proceeding that the superior court used the correct word, "aberrant."  We suggest to counsel that before impugning a judge's integrity, it is important to make sure that the charge rests on solid evidence.

whether an adverse inference can be drawn in a CINA case; and if so, whether there was sufficient evidentiary context to properly draw an adverse inference in this case.

We first hold that adverse inferences may be drawn from a parent's refusal to testify in a CINA case. The Fifth Amendment to the U.S. Constitution states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." When a defendant in a criminal case exercises the right not to testify, no inference of guilt may be drawn.[13]

But "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."[14] And in proper circumstances, "silence in the face of accusation is a relevant fact not barred from evidence by the Due Process Clause."[15]

We held in *Nelson v. State* that a "privilege assertion as to specific actions in combination with a factual dispute about those actions may give rise to a permissible and relevant adverse inference" in civil cases.[16] However, we emphasized that the "strength and cogency of the adverse inference should, of course, be tested against the other evidence in the case."[17] "Evidence of a privilege assertion void of context bears little to no weight in satisfying a party's evidentiary burden."[18] In *Nelson*, a post-conviction relief proceeding based on a claim of ineffective assistance of counsel, we

---

[13]   *Baxter v. Palmigiano*, 425 U.S. 308, 317 (1976).

[14]   *Id.* at 318; *see also* Alaska R. Evid. 512(d) (stating that Evidence Rule 512(a)'s prohibition against drawing inferences from claim of privilege "do[es] not apply in a civil case with respect to the privilege against self-incrimination").

[15]   *Baxter*, 425 U.S. at 319.

[16]   273 P.3d 608, 612 (Alaska 2012).

[17]   *Id.* (quoting *LiButti v. United States*, 107 F.3d 110, 124 (2d Cir. 1997)).

[18]   *Id.*

held an adverse inference from the attorney's refusal to testify had no weight when no specific evidence of the attorney's alleged incompetence was presented.[19]

Because a CINA case is not entirely like other civil cases, Brad argues that *Nelson*'s holding should not apply. He cites our statement in a CINA case that a parent "should not be penalized for invoking his Fifth Amendment privilege."[20]

But that case, *Rowan III*,[21] did not squarely address the propriety of an adverse inference. In *Rowan III* we upheld the superior court's denial of a father's request to delay termination proceedings pending appeal of his criminal convictions, explaining that permitting this delay "would drag out the most serious CINA cases to the detriment of children."[22] While we acknowledged the right to invoke the Fifth Amendment without penalty in a CINA case, we maintained that "[t]he best interests of children . . . are paramount."[23] Balancing the father's privilege against his children's "interest[s] in timely resolution of the proceedings," we held that the superior court did not abuse its discretion in denying the father's motion for continuance.[24]

Moreover, the passage in *Rowan III* that Brad cites was based on precedent that has been limited by more recent decisions. *Rowan III* relied on *Armstrong v. Tanaka*'s statement that the Fifth Amendment privilege protects the right of a person to

---

[19] *Id.* (noting that defendant could have asked judge to "allow question-by-question examination" that might have focused on specific actions and generated permissible adverse inferences).

[20] *Rowan B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.* (*Rowan III*), 361 P.3d 910, 914 (Alaska 2015) (quoting *Armstrong v. Tanaka*, 228 P.3d 79, 84 (Alaska 2010)).

[21] *Id.* *Rowan II* affirmed the CINA adjudication following *Rowan I*'s remand and is not relevant here. *Rowan B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-15107, 2014 WL 4057175 (Aug. 13, 2014).

[22] *Rowan III*, 361 P.3d at 915.

[23] *Id.* at 914.

[24] *Id.* at 914-15 (quoting *Tanaka*, 228 P.3d at 84-85).

remain silent without penalty.[25] But *Tanaka* was decided before *Nelson*, and *Nelson* held that it is permissible to draw an adverse inference from invocation of the right to remain silent in a civil case.[26] Therefore, the quoted language from *Rowan III* does not control our decision here.

The primary purpose of child protection proceedings is to protect the best interests of the children.[27] That goal is generally served by allowing the court to consider more information. For that reason we hold that an adverse inference is permissible in CINA cases.

---

[25] *Id.* at 914 ("An individual 'should not be penalized for invoking his Fifth Amendment privilege.'" (quoting *Tanaka*, 228 P.3d at 84)). ("The unique characteristics of child custody proceedings do not require alteration or modification of the rule permitting inferences from a party's failure to testify in a civil case."); *In re C.O.*, 203 A.3d 870, 882 (N.H. 2019) ("[T]he circuit court may draw an adverse inference from a parent's failure to acknowledge wrongdoing where it is relevant to determining whether the parent failed to correct the conditions that led to the findings of abuse or neglect, even where the parent has invoked her right against self-incrimination."); *In re Destiny D.*, 922 A.2d 168, 174 (R.I. 2007) ("[I]n the trial of a petition seeking the termination of parental rights, the Fifth Amendment does not forbid the drawing of adverse inferences against a party who refuses to testify. In this instance, the trial justice quite properly considered [plaintiff's] refusal to testify 'in light of all the other evidence' adduced at trial." (citation omitted) (quoting *In re Rosalie H.*, 889 A.2d 199, 206 (R.I. 2006))).

[26] *Nelson v. State*, 273 P.3d 608, 612 (Alaska 2012).

[27] *See, e.g.*, *Rowan III*, 361 P.3d at 914 ("The Alaska Statutes and our precedent establish a clear policy: The best interests of children, including the interest in permanency as opposed to leaving children in limbo, are paramount."); *R.F. v. S.S.*, 928 P.2d 1194, 1197 (Alaska 1996) ("In determining whether termination of parental rights and waiver of consent to adoption are proper, the best interests of the child are paramount."); *A.A. v. State, Dep't of Fam. & Youth Servs.*, 982 P.2d 256, 260 (Alaska 1999) ("[I]n a termination trial, the best interests of the child, not those of the parents, are paramount."); *see also* AS 47.10.005 ("The provisions of this chapter shall be liberally construed to . . . promote the child's welfare and the parents' participation in the upbringing of the child to the fullest extent consistent with the child's best interests.").

Our conclusion is consistent with the weight of authority from other jurisdictions.[28] Brad cites a single case from Maryland, *In re T.G.*,[29] in arguing that state courts have declined to draw adverse inferences in child welfare proceedings. But he misreads this case. In *In re T.G.*, the Maryland Court of Special Appeals determined that a juvenile court had not drawn an adverse inference from the mother's invocation of the Fifth Amendment and declined to address whether a court may draw an adverse inference under such circumstances.[30] In sum, there is scant legal support for Brad's position, and we reject it.

Turning to Brad's second argument, we conclude the superior court did not err in drawing specific inferences from Brad's refusal to testify. The court inferred that Brad "rubb[ed] his hands on . . . [Bettina's] breasts while in the shower naked" and that Brad and Bettina "slept or he cuddled with her in the nude naked in bed regularly [sic]."

These inferences were permissible because evidence of this specific conduct was presented to the court — in contrast to the *Nelson* case discussed above. The court considered Rebecca's statements that Brad and Bettina regularly took lengthy showers together and that Brad touched Bettina's breasts when washing her. Rebecca also stated that Brad slept naked and that Bettina commonly slept naked in her parents' bed as well. While Rebecca did state that Bettina and her other daughter sometimes needed help washing and conditioning their hair, there was no evidence presented that Bettina, who was 12 years old, could not otherwise wash herself. For example, no

---

[28] *See, e.g.*, *Melissa W. v. Dep't of Child Safety*, 357 P.3d 150, 152 (Ariz. App. 2015) ("A juvenile court's drawing a negative inference when a parent fails to testify at a severance hearing is particularly appropriate."); *Custody of Two Minors*, 487 N.E.2d 1358, 1363 (Mass. 1986)

[29] No. 864, 2019 WL 6769611, at *15 (Md. Spec. App. Dec. 12, 2019).

[30] *Id.* at *7 n.7.

evidence was presented that Bettina had an injury or a disability that would have required Brad to help her wash her body.

OCS called Brad to testify. However, Brad's attorney advised that Brad was invoking his right to remain silent under the Fifth Amendment and asserting a blanket privilege against any questions related to the subject of the criminal charges against him. Given the evidence of Brad's actions before the superior court, we conclude that the court's adverse inference from Brad's silence in the face of the evidence raised against him was not error.

### C. Brad's Conduct Cannot Be Reasonably Construed To Be "Normal Caretaker Responsibilities For A Child, Interaction With A Child, Or Affection For A Child."

In addition to challenging the superior court's factual findings, Brad argues that the evidence in the record did not establish that the children were in need of aid. A court may find a child to be in need of aid due to, among other reasons, "sexual abuse . . . as a result of conduct by or conditions created by the child's parent."[31] Sexual abuse means "sexual penetration" or "sexual contact."[32] Sexual contact includes "the defendant's knowingly touching, directly or through clothing, the victim's genitals, anus, or female breast."[33] However, sexual contact does not include acts "that may reasonably be construed to be normal caretaker responsibilities for a child, interactions with a child, or affection for a child."[34]

---

[31]    AS 47.10.011(7).

[32]    AS 47.10.990(33) (" '[S]exual abuse' means the conduct described in AS 11.41.410-11.41.460."); AS 11.41.434(a)(2) (defining sexual abuse of a minor in the first degree as when victim's natural parent engages in "sexual penetration" with victim); AS 11.41.436(a)(3) (defining sexual abuse of a minor in the second degree as when victim's natural parent engages in "sexual contact" with victim).

[33]    AS 11.81.900(b)(61)(A)(i).

[34]    AS 11.81.900(b)(61)(B)(i).

Under AS 47.10.019, a court "may not find a minor to be a child in need of aid . . . solely on the basis that the child's family is poor, lacks adequate housing, or exhibits a lifestyle that is different from the generally accepted lifestyle standard of the community where the family lives." However, this limitation "may not be construed to prevent a court from finding that a child is in need of aid" if the child has been subject to sexual abuse.[35]

Whether conduct meets the definition of "sexual contact" is a legal question that we review de novo.[36] We affirm the superior court's conclusion that Brad's conduct did not fall under the "normal caretaker," "interaction," or "affection" exceptions to the definition.[37]

Contrary to Brad's assertion, the evidence before the superior court was not simply that Brad washed his child, cuddled with her in bed, or spent time in the shower speaking to her. Regularly taking lengthy showers with a 12-year-old child and washing that child's breasts when she is well beyond the age at which she can do so herself is not normal caretaking, interaction, or affection. As noted above, there were no special circumstances that might have justified Brad's actions, such as an injury or developmental disability that might have called for caretaking of this nature.

Other evidence supports the conclusion that Brad's conduct cannot reasonably be construed as normal caretaking or affection. By the time Bettina's brothers reached her age, they had stopped showering with their father. Rebecca herself had suggested to Brad that he should stop showering with Bettina because she "[didn't] know if [Bettina] ever would've thought that it was weird" and that she "just didn't want to get to 16, 17 [years old]." Moreover, when asked whether Bettina had ever

---

[35]     AS 47.10.019.

[36]     *See S.H. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 42 P.3d 1119, 1122-23 (Alaska 2002).

[37]     *See* AS 11.81.900(b)(61)(B)(i).

made any comments that worried or concerned her, Rebecca stated that Bettina sometimes referred to Brad as "my sexy hubby," although she immediately downplayed the significance of these comments. Rebecca's expert testified that Rebecca had "normalized inappropriate sexual boundaries," and an OCS worker confirmed that Bettina did not need help showering.

Although a child may not be found in need of aid based on "a lifestyle that is different from the generally accepted lifestyle standard of the community where the family lives," Brad's washing of Bettina's breasts in these circumstances is not just a "lifestyle."[38] The statutory "lifestyle" limitation "may not be construed to prevent a court from finding that a child is in need of aid if the child has been subject to conduct or conditions described in AS 47.10.011-47.10.015," which includes sexual abuse.[39] And for the reasons we explained, Brad's conduct cannot reasonably be construed as normal caretaking, interaction, or affection.[40]

### D. Because We Affirm The Adjudication Order Based On Sexual Abuse, We Do Not Address The Remainder Of Brad's Arguments.

We need not decide a number of the arguments Brad raises. First, we do not address the argument about whether a finding of risk regarding one child supports a finding of risk to all.[41] We review the adjudication finding even though it is moot, because it may have collateral consequences for Brad.[42] For purposes of the collateral

---

[38] AS 47.10.019.

[39] AS 47.10.011(7); AS 47.10.019.

[40] Our conclusion does not rely on findings that Brad slept naked and that sometimes his children would crawl into bed with the parents and also sleep naked. This behavior, without more, can reasonably be construed as normal caretaking or interaction with a child.

[41] *See Rowan I*, 320 P.3d 1152, 1158 (Alaska 2014) (holding that "when a trial court finds a parent has sexually abused one child in the household, the court may presume that the other children in the household are at substantial risk of sexual abuse").

[42] *See supra* note 10.

consequences doctrine, it matters only whether a single child has been adjudicated in need of aid due to a parent's conduct.[43]  Brad has not argued that there are distinct collateral consequences that flow from adjudications of multiple children.  We therefore do not address this argument.

Next, we decline to address the court's finding that the children were in need of aid due to neglect.  Only one ground under AS 47.10.011 is necessary to sustain an order adjudicating a child in need of aid.[44]

Finally, we do not address arguments related to whether Rebecca was an "offending parent," because she has not pursued an appeal of the adjudication as to her conduct.

## V.    CONCLUSION

We AFFIRM the superior court's order adjudicating Bettina as a child in need of aid.

---

[43]    *See Reed S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 522 P.3d 182, 188 (Alaska 2022) (applying collateral consequences doctrine when single child was adjudicated in need of aid).

[44]    *Id.* at 194; *see* AS 47.10.011 ("[T]he court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that the child has been subjected to *any* of the following . . ." (emphasis added)).

CARNEY, Justice, concurring.

I agree that Brad and Rebecca's children were appropriately found to be in need of aid, but I write separately to point out what I believe was a clear error.

The court holds that there is no clear error where the superior court found that Brad "sometimes may have had" an erection in the shower with Bettina.[1] We conclude that this inference was appropriately based on Rebecca's testimony that he walked around the house with an erection, and on Rebecca's and others' descriptions of sexual contact during the lengthy showers.[2] We specifically base our conclusion there on the fact that "the court did not actually make a factual finding that Brad *had* an erection" in the shower.[3]

In contrast, the superior court *did* "actually make a factual finding that Brad *had* [] erection[s]" while in bed with Bettina.[4] Reaching this conclusion requires an additional inference beyond that required to infer that Brad "may have had" an erection in the shower with his daughter. It requires that we infer that in addition to getting erections when he is awake and walking around, he gets them when asleep, and specifically when he is sleeping *with Bettina* (rather than simply when sleeping).

I believe that it was clear error to find that Brad did have erections while in bed with Bettina. But in light of all the other evidence supporting a finding that the children were in need of aid due to sexual abuse, that error is harmless.

---

[1]    Opinion at 8.

[2]    *Id.* at 8-9.

[3]    *Id.* at 8.

[4]    *See id.*